ROBERT T. HASLAM (CA Bar No. 71134)
robert.haslam@hellerehrman.com
ANDREW C. BYRNES (CA Bar No. 191516)
andrew.byrnes@hellerehrman.com
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA  94025
Telephone:  (650) 324-7000
Facsimile:   (650) 324-0638

MICHAEL K. PLIMACK (CA Bar No. 133869)
michael.plimack@hellerehrman.com
DALE A. RICE (CA Bar No. 146249)
dale.rice@hellerehrman.com
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104
Telephone:  (415) 772-6000
Facsimile:   (415) 772-6268

Attorneys for Plaintiff and Defendant
RONALD A. KATZ TECHNOLOGY LICENSING, L.P.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Katz Interactive Call Processing Patent Litigation, | Case No. 07-ML-01816-B-RGK (FFMx) |
| This document relates to: | **RONALD A. KATZ TECHNOLOGY LICENSING, L.P.'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF RAKTL'S SELECTED CLAIMS UNDER SECTIONS 102 AND 103** |
| Ronald A. Katz Technology Licensing, L.P. v. Reliant Energy, Inc., CV 07-2096 RGK (FFMx) | |
| Ronald A. Katz Technology Licensing, L.P. v. TD Banknorth Inc., CV 07-2099 RGK (FFMx) | |
| Ronald A. Katz Technology Licensing, L.P. v. Ahold U.S.A., Inc., CV 07-2101 RGK (FFMx) | Date: |
| Ronald A. Katz Technology Licensing, L.P. v. Time Warner Cable Inc., CV 07-2134 RGK (FFMx) | Time:        9:00 a.m. Place:       Courtroom 850 |
| Ronald A. Katz Technology Licensing, L.P. v. American Int'l Group Inc., CV 07-2192 RGK (FFMx) | The Honorable R. Gary Klausner |
| CVS Corporation v. Ronald A. Katz Technology Licensing, L.P., CV 07-3002 RGK (FFMx) | |

Heller
Ehrman LLP

# TABLE OF CONTENTS

**Page**

I. Introduction ............................................................................................... 1

II. Legal Standards ........................................................................................ 2

    A. Standard for §102(a) Anticipation ................................................ 2

    B. Standard for §103 Obviousness .................................................... 3

III. The Claims at Issue Are Not Invalid Under Sections 35 U.S.C. §§ 102 and 103 ............................................................................................ 4

    A. Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 57 and 67 of the '120 Patent ............................... 4

        1. Claim '120:57 is Not Rendered Obvious by Student Registration Combined with Moosemiller .................................. 4

        2. Claim '120:57 is Not Rendered Obvious by Student Registration Combined with Calabrese ..................................... 8

        3. Claim '120:67 Is Not Rendered Obvious by Student Registration Combined with Calabrese ..................................... 9

        4. Claim '120:67 is Not Rendered Obvious by Student Registration Combined with Szlam ......................................... 11

    B. Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 96 and 98 of the '863 Patent ............................. 13

    C. Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 31, 35, 43, 53, 61 and 66 of the '965 Patent ................................................................................................ 16

        1. Szlam Is Not Prior Art to Claims '965:35, '965:43, '965:53, '965:61 and '965:66 .................................................. 16

        2. A POSITA Would Have No Motivation to Combine Yoshizawa with Szlam ......................................................... 19

i

3.    Summary judgment of obviousness of claim 31 must be denied because Szlam and Yoshizawa together do not teach the requirements of claim 31 .....................................24

4.    Claim '965:53 Is Not Rendered Obvious by Barger and Yoshizawa ........................................................................25

D.    Triable Factual Disputes Preclude Summary Judgment that Claims 14, 18 and 36 of the '360 Patent Are Obvious ......................27

1.    Limitations '360:13[3] and 360:13[5] Are Not Taught by Yoshizawa and VCT 1987 ......................................27

2.    A POSITA Would Have No Motivation to Combine Yoshizawa and VCT 1987 ........................................................29

E.    Triable Issue of Fact Prevent Summary Judgment as to Claim 5 of the '223 Patent....................................................................36

1.    Reese is Not Prior Art to the '223 Patent ................................36

2.    A POSITA Would Have No Motivation to Combine Friedes and Reese. ...................................................................36

3.    The Combination of Reese and Friedes Does Not Teach the Specific Means-Plus-Function Structures Required by '223:5 ..................................................................38

F.    Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 69, 85 and 92 of the '707 Patent........................39

1.    Limitation '707:69[2] Is Not Taught by McFiggins and Duwel ..............................................................................39

2.    Limitation '707:69[7] Is Not Taught by McFiggins and Duwel ..............................................................................43

3.    Claim '707:85 Is Not Taught by McFiggins and Duwel ..............................................................................44

4.    Claim '707:92 Is Not Taught by McFiggins and Duwel ..............................................................................45

IV.    The Evidence Showing Objective Indicia of Non-obviousness Creates a Triable Issue of Fact Precluding Summary Judgment...................45

ii

A.   Long-Felt Need ................................................................46

B.   Commercial Acquiescence ..............................................47

C.   Commercial Success ........................................................49

V.   Conclusion ..................................................................................50

KATZ'S OPPOSITION TO DEFENDANTS' MOTION          CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR SUMMARY JUDGMENT UNDER 102 & 103

1

2

## TABLE OF AUTHORITIES

3

<u>Page</u>

4

**CASES**

5

*All-Dental Prodx, LLC v. Advantage Dental Prods., Inc*.
   309 F.3d 774 (Fed. Cir. 2002).............................................................17

6

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ..............................................................................2

7

8

*B & H Mfg. Inc. v. Foster-Forbes Glass Co.*
   26 U.S.P.Q.2d 1066 (N.D. Ind. 1993)...........................................47, 49

9

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*
   229 F.3d 1120 (Fed. Cir. 2000)...........................................................49

10

11

*Connell v. Sears, Roebuck & Co.*
   722 F.2d 1542 (Fed. Cir. 1983).............................................................3

12

*Continental Can Co. v. Monsanto Co.*
   948 F.2d 1264 (Fed. Cir. 1991)...........................................................47

13

14

*Crown Operations Intern., Ltd. v. Solutia, Inc.*
   289 F.3d 1367 (Fed. Cir. 2002)......................................................17, 19

15

16

*Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*
   807 F.2d 955 (Fed. Cir. 1986)..............................................................39

17

*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*
   851 F.2d 1387 (Fed. Cir. 1988)......................................................46, 49

18

19

*Eibel Process Co. v. Minnesota & Ontario Paper Co.*
   261 U.S. 45 (1923) ..............................................................................47

20

21

*Elantech Devices Corp. v. Synaptics, Inc.*,
    2008 WL 1734748 (N.D. Cal. Apr. 14, 2008) ......................................1

22

*Enzo Biochem, Inc. v. Gen-Probe Inc.*
   323 F.3d 956 (Fed. Cir. 2002).............................................................17

23

24

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*
   149 F.3d 1309 (Fed. Cir. 1998).................................................2, 16, 19

25

26

*Falkner v. Inglis*
   448 F.3d 1357 (Fed. Cir. 2006)............................................................17

27

*Finisar Corp. v. The DirecTV Group, Inc.*
   ___ F.3d ___, 2008 WL 1757675 (Fed. Cir. Apr. 18, 2008) ................3

28

iv

*Gechter v. Davidson*
  116 F.3d 1454 (Fed. Cir. 1997)..................................................................2

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply*
  45 F.3d 1550 (Fed. Cir. 1995)...................................................................2

*Graham v. John Deere*
  383 U.S. 1 (1966) .................................................................3, 46, 49

*Hamilton v. Keystone Tankship Corp.*
  539 F.2d 684 (9th Cir. 1976)....................................................................8

*In re Gartside*
  203 F.3d 1305 (Fed. Cir. 2000)................................................................4

*In re Translogic Technology, Inc.*
  504 F.3d 1249 (Fed. Cir. 2007)..............................................................14

*KSR Int'l Co. v. Teleflex, Inc.*
  127 S. Ct. 1727 (2007) ...........................................................3, 45, 46, 49

*Mahurkar v. C.R. Bard, Inc.*
  79 F.3d 1572 (Fed. Cir. 1996).................................................................36

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*
  976 F.2d 1559 (Fed. Cir. 1992)...............................................................47

*Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh*
  139 F.3d 877 (Fed. Cir. 1998)..................................................................2

*Network Appliance, Inc. v. Bluearc Corp.*
  374 F. Supp.2d 825 (N.D. Cal. 2005) ....................................................14

*Nike Inc. v. Wolverine World Wide, Inc.*
  43 F.3d 644 (Fed. Cir. 1994)....................................................................2

*OmegaFlex, Inc. v. Parker-Hannifin Corp.*
  2007 WL 1733228 (Fed. Cir. June 18, 2007) ........................................4

*Orr v. Bank of America, NT & SA*
  285 F.3d 764 (9th Cir. 2002)....................................................................8

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*
  2008 WL 834402 (Fed. Cir. Mar. 31, 2008)...............................3, 4, 45

*Pandrol USA, LP v. Airboss Ry. Products, Inc.*
  424 F.3d 1161 (Fed. Cir. 2005)...............................................................17

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*
  491 F.3d 1342 (Fed. Cir. 2007)................................................................4

*RAKTL v. AT&T Corp.*
   63 F. Supp. 2d 583 (E.D. Pa. 1999) ............................................................43, 48

*Ryko Mfg. Co. v. Nu-Star, Inc.*
   18 U.S.P.Q.2d 1047 (D. Minn. 1990), *aff'd*, 950 F.2d 714 (Fed. Cir. 1991) ......45

*Safety Car Heating & Lighting Co. v. General Elec. Co.*
   155 F.2d 937 (2d Cir. 1946)..........................................................................46

*Smith v. Goodyear Dental*
   93 U.S. (3 Otto) 486 (1876) ..........................................................................49

*SRAM Corp. v. AD-II Engineering, Inc.*
   465 F.3d 1351 (Fed. Cir. 2006).......................................................................2

*Stratoflex, Inc. v. Aeroquip Corp.*
   713 F.2d 1530 (Fed. Cir. 1983).......................................................................46

*Teton West Constr. Inc. v. Two Rivers Constr. Inc.*
   961 F. Supp. 1422 (D. Idaho 1997)...............................................................8, 9

*TranscleanCorp. v. Bridgewood Servs., Inc.*
   290 F.3d 1364 (Fed. Cir. 2002)................................................................14, 16

*U.S. Surgical Corp. v. Ethicon, Inc.*
   103 F.3d 1554 (Fed. Cir. 1997).......................................................................2

*Vas-Cath, Inc. v. Mahurkar*
   935 F.2d 1555 (Fed.Cir. 1991).......................................................................17

*Verizon Cal., inc. v. Ronald A. Katz Technology Licensing L.P.*
   326 F. Supp. 2d 1060 (C.D. Cal. 2003) .........................................................19

*Woodland Trust v. Flowertree Nursery, Inc.*
   148 F.3d 1368 (Fed. Cir. 1998)........................................................................9

**STATUTES**

35 U.S.C. § 102(a) ..............................................................................................8

35 U.S.C. § 103(a) ..............................................................................................3

35 U.S.C. § 282....................................................................................................2

## I.    INTRODUCTION

Defendants waste the Court's time with a motion raising literally scores of triable factual issues regarding motivations to combine references, whether references are even prior art, and whether the asserted combinations would have made the claims obvious to a person of ordinary skill.  Not only are defendants' alleged combinations not obvious, many involve clear "teaching away" from the very combination asserted.  In many cases, even the asserted combination fails to teach all of the elements.

Defendants rely heavily on KSR's statement that applying known solutions to yield predictable results may well be obvious.  But defendants ignore that *KSR* confirmed the long-settled principle that before even considering whether a combination yields a predictable or unpredictable result, there must be "an adequate rationale by which a person of ordinary skill in the art *would combine* the elements that are allegedly present in the prior art."  *Elantech Devices Corp. v. Synaptics, Inc.*, 2008 WL 1734748, at *8 (N.D. Cal. Apr. 14, 2008) (emphasis added).  Ignoring this basic principle, defendants rely on outlandish combinations such as somehow engrafting a Japanese race track betting system together with an automated system for listening to records before buying.  Absent some specific, rational evidence of a motivation to combine, however, it is irrelevant whether the results of such a combination would have been "predictable" in hindsight.  *See Ortho-McNeil*, 2008 WL 834402, at *5 (flexible examination of the teaching, suggestion or motivation to combine "remains the primary guarantor against a non-statutory hindsight analysis.")

Moreover, defendants fail to address, much less eliminate as a matter of law, the strong objective indicia of non-obviousness, including literally hundreds of licenses to industry leaders, commercial acquiescence, long felt need, and commercial success.[1]

---

[1] Despite the strong language in the introduction to defendants' brief denouncing the Katz patents, citing the crowded field of prior art, alleged delays in prosecution, and alleged "lying in wait" to draft claims reading on commercial products, defendants have argued, incorrectly, that only three of the asserted claims are anticipated, and have not filed a prosecution *laches* motion despite the Court's invitation to do so, facts that speak volumes on the merits of those contentions.

1   These secondary considerations standing alone are a sufficient reason to deny

2   summary judgment.

3   **II.   LEGAL STANDARDS**

4          Summary judgment is appropriate only "when there is no genuine issue as to

5   any material fact and the moving party is entitled to judgment as a matter of law."

6   *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994).  All facts

7   and inferences must be construed in the light most favorable to the non-movant.

8   *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed. Cir.

9   1998).

10         "[I]n rendering a decision on a motion for summary judgment, a court must

11  'view the evidence presented through the prism of the substantive evidentiary burden'

12  that would inhere at trial."  *Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh*, 139

13  F.3d 877, 880-881 (Fed. Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

14  242, 254 (1986)).  A patent enjoys the presumption of validity, 35 U.S.C. § 282, which

15  can be overcome only through clear and convincing evidence, *U.S. Surgical Corp. v.*

16  *Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997).  Thus, a moving party seeking to

17  invalidate a patent at summary judgment "must submit such clear and convincing

18  evidence of facts underlying invalidity that no reasonable jury could find otherwise."

19  *SRAM Corp. v. AD-II Engineering, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006).

20         **A.      Standard for §102(a) Anticipation**

21         A patent is invalid for anticipation under 35 U.S.C. § 102(a) only if "all of the

22  elements and limitations of the claim are found within a single prior art reference.

23  Anticipation is, of course, a question of fact.  *Glaverbel Societe Anonyme v. Northlake*

24  *Mktg. & Supply*, 45 F.3d 1550, 1554 (Fed. Cir. 1995).  Anticipation requires proof of

25  "identity of the invention," *i.e.*, "every limitation of a claim must identically appear in

26  a single prior art reference."  *Gechter v. Davidson*, 116 F.3d 1454 (Fed. Cir. 1997).

27  Thus, as the Federal Circuit reiterated just this month, "disclosure of each element is

28  not quite enough—this court has long held that '[a]nticipation requires the presence in

2

a single prior art disclosure of all elements of a claimed invention *arranged as in the*
*claim.*'" *Finisar Corp. v. The DirecTV Group, Inc.*, ___ F.3d ___, 2008 WL 1757675,
at *10 (Fed. Cir. Apr. 18, 2008) (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d
1542, 1548 (Fed. Cir. 1983)) (emphasis in original).

### B.   Standard for §103 Obviousness

A patent is obvious only if it is established by clear and convincing evidence
that the differences between the patent claim and the prior art "are such that the
subject matter as a whole would have been obvious at the time the invention was made
to a person having ordinary skill in the art." 35 U.S.C. § 103(a). The test for
obviousness was set forth by the Supreme Court in *Graham v. John Deere*, 383 U.S. 1
(1966), and includes several fact-based inquiries: (a) the scope and content of the
prior art; (b) the differences between the prior art and the claims; (c) the level of
ordinary skill in the art at the time of the invention and (d) secondary considerations or
objective indicia of nonobviousness. *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727,
1729-30 (2007).

In its recent *KSR* ruling, the Court confirmed that "a patent composed of several
elements is not proved obvious merely by demonstrating that each of its elements was,
independently, known in the art." *Id.* at 1741-42; *Ortho-McNeil Pharm., Inc. v. Mylan
Labs., Inc.*, No. 2007-1223, 2008 WL 834402, *5 (Fed. Cir. Mar. 31, 2008) ("[One
may not] simply retrace[] the path of the inventor with hindsight, discount[] the
number and complexity of the alternatives, and conclude[] that the invention . . . was
obvious."). And, while the "teaching-motivation-suggestion" test ("TSM test") must
not be applied too rigidly, it is still "important to identify a reason that would have
prompted a person of ordinary legal skill in the art to combine the elements as the new
invention does." *KSR*, 127 S. Ct. at 1742. As the Federal Circuit just explained:

> [A] flexible TSM test remains the primary guarantor against a non-
> statutory hindsight analysis such as occurred in this case. The TSM test,
> flexibly applied, merely assures that the obviousness test proceeds on the
> basis of evidence – teachings, suggestions (a tellingly broad term), or
> motivations (an equally broad term) – that arise before the time of

invention as the statute requires.

*Ortho-McNeil*, 2008 WL 834402, *5.  This "requires the analysis to examine 'the subject matter as a whole' to ascertain if it '*would have been obvious at the time the invention was made*.'"  *Id.* (quoting 35 U.S.C. § 103) (emphasis by court).  Continuing, the Federal Circuit warned:

> In retrospect, [the inventor's] pathway to the invention, of course, seems to follow the logical steps to produce these properties, but at the time of invention, the inventor's insights, willingness to confront and overcome obstacles, and yes, even serendipity, cannot be discounted.

The existence of a "reason" to combine the disparate pieces of prior art is "a pure question of fact."  *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007) ("[T]he burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so.").  Thus, an expert declaration explaining why the prior art would not have led to the claimed invention will defeat summary judgment.  *Cf. OmegaFlex, Inc. v. Parker-Hannifin Corp.*, 2007 WL 1733228, *3 (Fed. Cir. June 18, 2007) (finding summary judgment on obviousness inappropriate due to competing expert testimony).

## III.  THE CLAIMS AT ISSUE ARE NOT INVALID UNDER SECTIONS 35 U.S.C. §§ 102 AND 103

### A.  Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 57 and 67 of the '120 Patent

#### 1.  Claim '120:57 is Not Rendered Obvious by Student Registration Combined with Moosemiller

Defendants are incorrect that claim '120:57 is obvious in light of the combination of Student Registration and Moosemiller.

4

### a.   Limitation '120:57[6] Is Not Taught by Student Registration and Moosemiller

> **'120:57[6]**   utilizing, for qualified callers, the identification signals relating to the callers, to avoid prompting certain callers with a certain previously provided cue or cues;

One of the fundamental teachings of claim 57 is cue suppression, *i.e.,* using caller-entered identification data first to identify a caller, and then avoid playing a cue or cues that caller heard on previous call. *Order Re: Claim Constr.* at 45-46 (defining "cue suppression" as "identification signals . . . to prevent qualified callers from receiving one or more specific prompts that the callers previously received"). Because neither Student Registration nor Moosemiller even hints at this concept, these references cannot render Claim 57 obvious. *See* Brody ¶¶ 75-79.[2]

Defendants argue that Student Registration discloses cue suppression because there were three messages that system might or might not play for callers, depending on their registration status:

> 12: "You may not register until January fifth at eleven A.M. You may register any time after your assigned date and time, but not before."

> 13: "Your registration has been encumbered by the business office. Please call 556-0123 for assistance. 556-0123. You may not register until you have contacted the appropriate office and they have cleared the hold placed on your record."

> 15: "You are not eligible to register. Please call 556-2345 for assistance. 556-2345."

Prieve ¶ 285; *see* Mem. at 14. But this does not teach cue suppression:

*First*, these messages are not "cues" within the meaning of Claim 57. This Court followed the *AT&T* court's correct construction of "cue" in the '120 patent's claims as meaning "a *question* or *prompt* which is given to a caller." *Order Re: Claim Constr.* at 57 (emphasis added). Thus, to "avoid prompting certain callers with a

---

[2] This format is used to cite to the declarations of Dr. Arthur Brody, Ronald Katz, Reena Kuyper, James Tramontana, and Chris Martiniak submitted with and in support of this opposition brief. We use the same format for citing to the declaration of Bart Prieve submitted by defendants in support of their motion.

certain previously provided cue or cues," per limitation '120:57[6], the system must suppress a previously provided *question* or *prompt*. *See* Brody ¶¶ 76-77. But the messages above are neither questions nor prompts. They neither ask the caller *for* anything nor prompt the caller to *do* anything within the system. They are simply informational messages and, as such, do qualify as "cues" within the meaning of 120:57. *See* Brody ¶¶ 76-77.

**Second**, Student Registration does not disclose avoiding "*prompting certain callers with a certain previously provided cue or cues*" as required by 120:57[6]. Rather, Defendants concede that Student Registration provided different messages to a caller "*depending on registration status*," Mem. at 14, which is a fundamentally different concept from suppressing a cue *because it had previously been played* to that caller. Brody ¶ 78. Student Registration would refrain from playing certain messages to *any* caller who was eligible immediately to register, without regard to whether they were "*previously provided* cue[s]"—simply, the Student Registration system does not track of what cues were previously played, nor would it care. *Id.*

### b. A POSITA Would Have No Motivation to Combine the Use of DNIS from Moosemiller with Student Registration

> **'120:57[3]**   utilizing the dialed-number identification signals to identify one from a plurality of numbers dialed by the callers;

Claim '120:57 requires a system that receives DNIS signals and uses them to "identify one from a plurality of numbers" that callers are using to reach the system. Brody ¶ 80. Although Moosemiller disclosed a DNIS feature, there would have been no motivation to combine this DNIS disclosure with the Student Registration system. *Id, ¶¶* 80-82.

Student Registration expressly contemplated that students would make *local calls* to the registrar's system, and often would call from within the college telephone system without even reaching the public switched network. Brody ¶ 81; *see* Student Registration at D1-D2 ("Call the system number: 566-3876 (55-Metro)"). Moreover,

6

the Student Registration system involved a single application; there is no evidence that colleges needed multiple applications that might require DNIS to identify the proper application for a given call or effectively to handle call volumes.  Brody ¶ 81.  Under these circumstances, there is simply no reason to believe a college would have been interested in incurring the added expense and complexity of using DNIS to identify the calling number in connection with a Student Registration application.  *Id.* Thus there is no motivation to combine these references.

Nor does Defendants' citation of Teleregistrar make a difference.  *See* Mem. at 14; Prieve ¶ 94.  Teleregistrar does not teach the use of DNIS to select a format.  Brody ¶ 82.  Moreover, Teleregistrar (dated July 20, 1989) is not prior art to the '120:57, which has an effective filing date of May 16, 1988.  *See* Brody ¶¶ 190-222.

Defendants are likewise wrong that the USPTO, when considering a petition for re-examination of claims of the '120 patent, "confirmed" Dr. Prieve's conclusions regarding a motivation to combine Student Registration and Moosemiller. Prieve ¶¶ 97-98, 196-197. The USPTO merely concluded that the combination had not been considered before and that it raises a substantial new question of patentability – the stock phrase used when initiating a reexamination.  Prieve Exh. 43, p. 13.  Indeed, the USPTO has used the same "substantial question" language in other reexaminations in which Katz claims were nevertheless reissued, sometimes after having initially been rejected.  The USPTO has simply made no decision on the merits yet, and certainly has not made a final determination.[3]

---

[3] Dr. Prieve makes similar allegations regarding reexamination proceedings when considering the '120 vs. Student Registration and Calabrese, (Prieve ¶¶ 117-120, 250-252, 308-309); the '120 vs. Student Registration and Szlam (*Id.* ¶¶ 125-126); the '965 vs. Yoshizawa and Szlam (*Id.* ¶¶ 145-154, 440-441, 496-497, 569-570, 643-644, 719-719) and the '965 vs. Barger and Yoshizawa (*Id.* ¶¶ 174-175, 580-581)  For the same reasons as discussed above, these allegations are without merit.

7

### 2. Claim '120:57 is Not Rendered Obvious by Student Registration Combined with Calabrese

Defendants are also incorrect that claim '120:57 is rendered obvious by the combination of Student Registration and Calabrese.

#### a. Limitation '120:57[6] Is Not Taught by Student Registration and Calabrese

*First*, Defendants rely entirely on the Student Registration reference as purportedly disclosing the key concept of cue suppression. *See* SUF ¶¶ 292-296. As noted above, this is incorrect because defendants have not identified "cues" and because Student Registration selects its messages based on registration status, not whether they have been previously provided. *See supra* § III.A.1.a; *see also* Brody ¶ 83. *Second***,** as also noted above, there would have been no motivation to combine the Student Registration reference with the use of DNIS, and this is just as true for Calabrese's discussion of DNIS as for the Moosemiller reference discussed above. *See supra* § III.A.1.b; *see also* Brody ¶ 83.

#### b. Calabrese is Not Prior Art to the Claim '120:57

##### i. Defendants Offer Insufficient Evidence that Calabrese Is § 102(a) Prior Art

In addition, Calabrese is not even prior art to '120:57. To establish a reference as § 102(a) prior art, Defendants must prove it "was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). Evidence "which ha[s] not had a proper foundation laid to authenticate [it] cannot support a motion for summary judgment." *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976); *see, e.g.*, *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment.") (citing cases). This requirement is no different in patent cases than for any other. *Teton West Constr. Inc. v. Two Rivers Constr. Inc.*, 961 F. Supp. 1422, 1430-31 (D. Idaho 1997) ("This

8

1  evidence has not been properly authenticated and thus the Court must disregard it in

2  this summary judgment proceeding.").

3         Defendants assert that Calabrese was "published in September 1989," SUF ¶ 66,

4  but cite only to Dr. Prieve's Declaration as support.  Dr. Prieve, in turn, only states

5  that Calabrese is "dated September 1989," with no alleged personal knowledge of the

6  publication date.  Prieve ¶ 34.  Although defendants assert that the Calabrese paper

7  was presented at the AVIOS Conference in September of 1989 (*see* Prieve ¶ 34), they

8  provide no evidence about the attendees or public availability of that conference.  *See*

9  *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998)

10  ("[T]o invalidate a patent based on prior knowledge or use, that knowledge or use

11  must have been available to the public.")  Nor do they offer any evidence that the

12  Calabrese paper was actually presented or distributed, in its final form, at the

13  Conference.  Conference papers are often published only long after the fact.  *See*

14  Brody ¶ 84.  As such, there is no competent evidence that the Calabrese reference

15  predates the '120 patent's priority date.  *Teton West*, 961 F. Supp. at 1430-31.

### ii.  The Conception Date for Claim '120:57 Pre-Dates Calabrese

18         In any event, the proper effective filing date for '120:57 is May 16, 1988, well

19  before the alleged September, 1989 publication date for Calabrese.  *See* Brody, Decl.

20  ¶¶ 190-222.  Accordingly, Calabrese fails to qualify as § 102(a) prior art with respect

21  to Claim 57 of the '120 patent.

### 3.  Claim '120:67 Is Not Rendered Obvious by Student Registration Combined with Calabrese

23         Defendants are also incorrect that Claim '120:67 is obvious in light of Student

24  Registration in combination with the Calabrese reference.

KATZ'S OPPOSITION TO DEFENDANTS' MOTION                    CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR SUMMARY JUDGMENT UNDER 102 & 103

### a.   Limitation '120:67[4] Is Not Taught By the Combination of Student Registration and Calabrese

| '120:67[4] | utilizing, for qualified callers, the identification signals that indicate the telephone numbers to avoid prompting certain callers with a certain previously provided cue or cues; |
|---|---|

Defendants' obviousness arguments fail as to claim '120:67 because neither Student Registration nor Calabrese teach cue suppression. *See supra* §§ III.A.1.a-III.A.1.b. Defendants rely entirely on Student Registration to disclose cue suppression, (*see* SUF ¶¶ 369-382) but the messages they rely upon are not cues, and their selection or lack thereof has nothing to do with "avoiding prompting certain callers with a certain previously provided  cue or cues." Brody ¶¶ 76-78, 85. To the contrary, they are selected—as Defendants concede, *see* SUF ¶ 343; Prieve ¶ 335—based on the student's account status, not because they had been previously provided. *See* Brody Dec. ¶ 85.

### b.   Calabrese is Not Prior Art to the Claim '120:67.

As explained above, Calabrese came too late to be § 102(a) prior art for '120:67. Claim 67 has a priority date of May 16, 1988, well before the alleged September, 1989 publication date for Calabrese. *See supra* § III.A.2.b; Brody ¶¶ 190-222.

### c.   A POSITA Would Have No Motivation to Combine the Use of ANI to Identify Callers from Calabrese with Student Registration

Defendants are further incorrect that there was motivation to combine Student Registration with Calabrese's use of ANI to identify the calling party. Brody ¶¶ 87-90. Student Registration involves an application designed to allow college students to register, by means of local calls, in an automated fashion. *Id.* ¶ 87. Calabrese, in contrast, is purportedly a presentation by the Travelers Companies about their plans for advanced VRU applications in the insurance business. There is simply no

10

1   evidence that one skilled in the art would have thought to combine these two very

2   different applications.  *Id.*

3        This is especially true with respect to combining Student Registration with

4   Calabrese's use of ANI to identify the calling system.  ANI-based identification of the

5   caller makes sense in the context of an insurance company like Travelers, as customers

6   will typically call from home, and thus with a consistent calling number.  Brody ¶ 88.

7   In this context, ANI is an efficient way to identify the caller.  *Id.*

8        In contrast, using ANI to identify the caller makes no sense in the context of

9   students calling to register for college.  Brody ¶¶ 89-90.  Student telephone numbers

10  change all the time.  From semester to semester, college students move from one

11  housing situation (and telephone) to another, particularly in the days before

12  widespread and inexpensive cell phones for students.  Moreover, students often share

13  telephones (and numbers) among several individuals sharing a house or dormitory.

14  Accordingly, it makes no sense to use the calling number—ANI—to identify the caller

15  in the context of students registering for college courses.  *Id.*  This is why the Student

16  Registration reference expressly contemplates identifying callers based on their entry

17  of a "*student ID number*," not the calling number.  *Id.*, at 89; *see* Student Registration

18  at A-1.

### 4.   Claim '120:67 is Not Rendered Obvious by Student Registration Combined with Szlam

19
20       Defendants are equally misguided in arguing that claim '120:67 is obvious in

21  light of Student Registration combined with Szlam.

22
### a.   Limitation '120:67[4] Is Not Taught by Student Registration and Szlam

23

24

| '120:67[4] | utilizing, for qualified callers, the identification signals that indicate the telephone numbers to avoid prompting certain callers with a certain previously provided cue or cues; and |
|---|---|

25

26

27       As with claim '120:57, defendants' obviousness arguments fail as to claim

28  '120:67 because Student Registration does not teach cue suppression, *see supra* §

11

1 III.A.1.a and Brody ¶ 92.  The messages defendants identify are not "cues," and they

2 are not selected to "avoid prompting certain callers with a certain previously provided

3 cue or cues," *see supra* § III.A.1.b and Brody ¶ 92.  To the contrary, the messages

4 are—as Defendants concede, *see* SUF ¶ 381; Prieve ¶ 373—selected exclusively based

5 on the student's account status.  *See* Brody ¶ 92.  Since defendants do not even argue

6 that Szlam teaches cue suppression (see SUF ¶¶ 369-382), that reference cannot cure

7 Student Registration's failure to teach this key concept of '120:67.

8          **b.     A POSITA Would Have No Motivation to Combine the**
**Use of ANI to Provide Preliminary Customer Account**
9          **Information on the Caller from Szlam with Student**
**Registration**
10

11          Defendants are incorrect that there would have been any motivation to combine

12 the Student Registration reference with Szlam's discussion of ANI.  *See* Brody ¶¶ 93-

13 95.  Student Registration involved a system for automated handling of student calls to

14 the registrar for course selection.  *Id.* ¶ 93.  Szlam, on the other hand, concerned call

15 center technology for "businesses, especially those with large numbers of customer

16 accounts."  *Id.; see also* Szlam at 1:13-15.  There was no motivation to combine these

17 two disparate applications designed for very different situations.  Brody ¶ 93.

18          Further, the Szlam uses ANI to retrieve preliminary information about a calling

19 customer and to provide that information at an operator terminal.  *Brody ¶* 94; *see*

20 Prieve, ¶¶ 74-75; Szlam at 2:48-58.  As explained above, it made no sense to use ANI

21 to identify calling students.  *See supra* § III.A.3.c; Brody ¶ 95.   Because students were

22 not identifiable through the often-changing and often-shared telephones they would

23 call from, Szlam's ANI-based identification technique was inappropriate for a Student

24 Registration system, and a person skilled in the art would not have had any motivation

25 to combine the two references.  *Id.*

26

27

28

## B.   Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 96 and 98 of the '863 Patent

| | |
|---|---|
| **'863:96[4]** | record structure including memory and control means for storing answer data signals and for receiving identification data signals for specific of said individual callers, said record structure further including means for receiving additional identification data signals on-line for said specific of said individual callers and for storing said additional identification data signals in said record structure for subsequent identification of said individual callers; |
| **'863:96[6]** | qualification structure for verifying said identification data signals for specific of said individual callers against a file of stored identification data. |

The principal flaw in Defendants' argument regarding independent claim '863:96 and dependent claim '863:98 is their incorrect construction of the claims as "essentially" disclosing only "a system wherein callers input information to the system for storage and processing in response to voice prompts provided by the system." Mem. at 16-17.  To the contrary, these claims disclose a system that performs an explicit set of identified functions.[4]  First, there must be a record structure for "receiving identification data signals" for callers, per limitation '863:96[4].  Brody ¶ 97.  Second, there must be a  "qualification structure" that verifies those identification data signals against a "file of stored identification data," per limitation '863:96[6].  *Id.*  Third, the record structure element of '863:96[4] requires "means for receiving *additional identification data signals on-line*" and "*storing said additional identification data signals in said record structure for subsequent identification*" of the individual callers.  *Id.*

Defendants cannot demonstrate that claims '863:96 and '864:98 are obvious without identifying art that teaches or makes obvious these specific functions:  (1) receiving identification signals, (2) verifying them, and then (3) receiving additional identification signals from callers that the system uses to identify those callers in subsequent calls.  *See, e.g.*, *TranscleanCorp. v. Bridgewood Servs., Inc.*, 290 F.3d

---

[4] Moreover, Defendants do not even try to explain how Moosemiller and Wendkos disclose the specific structure corresponding to the means-plus-function elements disclosed in 863:96[4] and [5].   Brody ¶ 97.

1   1364, 1372 (Fed. Cir. 2002) (to disclose the elements of a means-plus-function

2   limitation, the reference "must disclose the recited function identically"); *Network*

3   *Appliance, Inc. v. Bluearc Corp.*, 374 F. Supp.2d 825, 840 (N.D. Cal. 2005) ("the

4   assertedly equivalent structure" must perform "the claimed function . . ."). The Court

5   must thus consider these key functions—expressly required by '863:96 and '864:98—

6   in deciding whether the "differences between the subject matter sought to be patented

7   and the prior art are such that the subject matter as a whole would have been obvious."

8   *In re Translogic Technology, Inc.*, 504 F.3d 1249, 1256 (Fed. Cir. 2007)(*quoting* 35

9   U.S.C. § 103).

10         Neither Wendkos nor Moosemiller—nor any other prior art identified by

11   Defendants—even hints at these specific functions. Brody ¶¶ 98-99. Moosemiller

12   discloses a system that receives a *single* identification code that is verified; it does not

13   suggest "receiving additional identification data signals on-line" and "storing said

14   additional identification data signals in said record structure for subsequent

15   identification." Brody ¶ 99. And, none of the applications disclosed in Wendkos

16   describes the specific functions of claims '863:96 and '864:98:

17         The *Tom Seaver/Sporting News application* (Wendkos at 59, Col. 1) discloses

18   that the caller is asked to speak their name and address in order to initiate delivery of

19   their subscription. The application does not teach that this data is verified "against a

20   file of stored identification data" nor is stored and used for subsequent identification of

21   the caller. *See* Brody ¶ 99.

22         The *Maxwell House Trivia Challenge application* (Wendkos at 60) required the

23   caller to enter a product code, but this code identified the *product*, not the caller.

24   Further, there was no hint of receiving additional identification data and storing it for

25   subsequent identification. Brody ¶ 99.

26         The *PeopleExpress travel reservation application* (Wendkos at 60) did not

27   require the caller to enter identification data that the system verified against a file of

28   stored identification data. *Id.* While it did allow callers to enter a 7-digit code, that

14

1  was used to identify the customer "at check-in;" it did not disclose storing that code in

2  the record structure of the call center for use in subsequent identification of "callers."

3  *Id.*

4        The *Teleshopper application* (Wendkos at 61, Col. 1-3) allowed callers to enter

5  their account number *or* credit card information (number and expiration date), and

6  name and address information.  The credit card information is given via touch-tone

7  signals, while name and address information is spoken by the caller. There is no

8  suggestion that the Teleshopper application received additional identification data and

9  stored it for subsequent identification data of callers.  A caller who is a new customer

10  will be prompted to enter "3" (no account number).  After the caller provides credit

11  card, name and address information, the system *gives* the customer  an account

12  number.  *See* Brody 99.  While the Teleshopper system thus gave callers an account

13  number *generated by the system* for use in future calls, this identification data was

14  created by the system, not (as required by claims '863:96 and '864:98 ) *received* by

15  the system (*i.e.*, entered by callers).  Also, the credit card number was checked but not

16  stored to be used for subsequent identification of the caller as required. The *next time*

17  this customer calls, in contrast, they would enter "1" (have an account number) and

18  then enter the account number which is used for identification.  Again, there is no

19  *additional* identification data being stored for subsequent identification as required by

20  the claim.  *See* Brody ¶ 99.

21        Indeed, Defendants' moving papers do not even attempt to argue that

22  Moosemiller and Wendkos teach these functions of receiving identification signals,

23  verifying them, and then receiving additional identification signals from callers that

24  the system uses to identify those callers in subsequent calls.  *See* Mem. at 16-17; SUF

25  ¶¶ 387-446; Prieve ¶¶ 383-437 & Ex. 32.  To the contrary, Defendants simply

26  mischaracterize the claims, as noted above, in an attempt to gloss over the operative

27  language of the limitations.  *See* Brody ¶ 100.

28

Defendants alternatively argue that Moosemiller discloses a "host computer" and in retrospect that the computer structure *could* have performed the functions required by claims '863:96 and '864:98. *See, e.g.*, SUF ¶ 412; Prieve ¶ 407. As explained above, however, this is simply not the law. To serve as prior art, a reference must not only describe the *structure* identified in a means-plus-function claim, it must also "disclose the recited *function* identically." *TranscleanCorp.*, 290 F.3d at 1372 (emphasis added). Nothing in Moosemiller (nor Wendkos, for that matter) discloses the functions described in these claims. *See* Brody ¶ 101.

### C. Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 31, 35, 43, 53, 61 and 66 of the '965 Patent

#### 1. Szlam Is Not Prior Art to Claims '965:35, '965:43, '965:53, '965:61 and '965:66

The Szlam patent was filed on June 16, 1987, and there is a dispute of fact whether it is prior art to claims '965:35, '965:43, '965:53, '965:61 and '965:66. Defendants do not contest that these claims are supported by their parent '968 patent, filed on February 24, 1987. Instead, defendants argue that the February 24, 1987 priority date for these claims is precluded because an intervening specification in the chain—the '739 patent—does not support the claim limitations involving display of certain information at the operator's terminal. Mem. at 17-18; SUF ¶¶40-47. But, as Dr. Brody demonstrates, under the correct legal standard, the claims at issue are fully supported by both the '739 and '968 patents and thus are entitled to the earlier priority date which predates Szlam. Brody ¶ 102 And, on this Motion, inference must be drawn in favor of Katz, so it must be presumed that Szlam is not prior art. *Ethicon Endo-Surgery,* 149 F.3d at 1315.

### a. The "Possession Test" Is the Correct Legal Standard for Finding Written Description Support for a Patent Claim

Defendants invite the Court into legal error in their argument that the Statistical Interface "specification does not *describe* visually displaying" various caller identification data as the claims recite.  Mem. at 18 (emphasis added).

Whether the subject matter of a patent claim meets the written description requirement of 35 U.S.C. § 112, ¶ 1 is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date.  *Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006); *All-Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 778 (Fed. Cir. 2002).  To fulfill this requirement, "the disclosure must convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention."  *Crown Operations Intern., Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002); *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 424 F.3d 1161, 1165 (Fed. Cir. 2005)  The applicant "*does not have to describe exactly the subject matter claimed*, ...the description must clearly allow a [POSITA] to recognize that [he or she] invented what is claimed." (emphasis added and internal citations omitted) *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1562-63 (Fed.Cir. 1991).  Put another way, the patent's disclosure "must allow one skilled in the art to visualize or recognize the identity of the subject matter purportedly described." *Enzo Biochem, Inc. v. Gen-Probe Inc.,* 323 F.3d 956, 968 (Fed. Cir. 2002).

### b. Using the Possession Test, There Is at Least a Triable Issue of Fact that the Claims at Issue are Supported by the '739 Patent

The key question here is whether the '739 patent's specification makes disclosures showing possession of the '965 claim's requirements of displaying data from a customer file, such as customer identification number, the caller name, or telephone number.  The '739 specification describes a call-processing system that visually displays the caller memory cell contents and caller data analysis.  It also describes that the stored or processed data includes customer numbers, caller-entered

17

1   identification data, telephone number data, and other data.  Brody ¶ 103.  This link

2   between the display of information from the caller memory cells, and the contents of

3   those cells, is enough to establish that the inventor was in possession of the claims at

4   issue.

5        The patent links the interface terminal IT and the command terminal CT to the

6   function of "visually displaying" various items of data.  The patent teaches that the

7   "status of the analysis" involved "in any of the various formats" disclosed in the

8   patent, *may be visually displayed by the IT.*  '739 patent at 20:40-44 (emphasis added).

9   The patent further describes various formats where the "status of the analysis"

10  includes customer numbers, telephone numbers, caller name and other data.  *Id.*  at

11  11:26-32; 10:64-11:1 (customer number).  *Id.* at 6:54-7:31; 7:29-31 (telephone

12  number). Figures 2, 5 and 7 show other data stored in memory including caller's

13  telephone number (item 53, Fig. 2, item 201 Fig. 7), name and address data (item 138,

14  Fig. 5). The IT terminal will also display customer data retrieved using the customer

15  number when an existing customer chooses to go to an operator. Brody ¶¶ 104-107

16       The function of "visually displaying customer number data" is also linked to

17  "command terminal CT."  *Id.* at 21:67-22:7.  The command terminal CT includes a

18  display.  *Id.* at 5:18-23 ("command computer terminal CT (incorporating a CRT

19  display)").  A POSITA would understand that the patent  teaches that the command

20  terminal CT is involved in data-gathering and processing for a variety of applications.

21  The data may expressly include "caller data from individual memory cells" which

22  would be understood to encompass the customer number data, telephone data and

23  other data that may also be stored in the processors' memory cells, such as shown in

24  Figures 2, 5 and 7.  Thus the command terminal CT is also linked to the function of

25  visually displaying customer number data.   Brody ¶ 108

26       Thus the display of "other data" (claim 35), "telephone number data" (claim

27  43), "caller name data" (claim 53) and a "portion of data stored in said file" (claims 61

28  and 66) are each supported.  These teachings disclose, to the skilled artisan at the time,

1   that the inventor possessed the claimed inventions of visually displaying these

2   identification data.  *Crown Operations Intern., Ltd. v. Solutia, Inc.,* 289 F.3d 1367,

3   1376 (Fed. Cir. 2002). Brody ¶ 109

4          Defendants ignore this Court's correct findings in *Verizon* that this

5   "specification clearly links the 'visually displaying [customer number data]' function

6   to the command CRT display terminal," *Verizon Cal., inc. v. Ronald A. Katz*

7   *Technology Licensing L.P.*, 326 F. Supp. 2d 1060, 1098-99 (C.D. Cal. 2003) (citing

8   '551 patent at columns 22-24), and "appears to identify the interface terminal IT as

9   capable of visually displaying customer data on a selected customer," *id.* at 1102

10  (citing '065 patent at 19:63-65).

### c.      Szlam Is Presumed Not to Be Prior Art to These Claims in a Motion for Summary Judgment of Invalidity

13         On this motion all reasonable inferences must be drawn in favor of the non-

14  moving party.  *Ethicon Endo-Surgery, Inc.,* 149 F.3d at 1315.  Dr. Brody provides

15  testimony a jury would credit in finding that the claims at issue from the '965 patent

16  are supported by the '739 patent and therefore claim priority back to the  February 24,

17  1987 filing date of the parent '968 patent.  Indeed, at summary judgment the Court

18  must assume the jury *will* credit Dr. Brody's testimony in this regard.  Accordingly,

19  the Szlam patent, which was not filed until June 10, 1987, it is not prior art to these

20  claims.  All of Defendants' assertions based on Szlam must therefore be rejected.

### 2.      A POSITA Would Have No Motivation to Combine Yoshizawa with Szlam

23         Defendants are incorrect that the Court can summarily determine claims

24  '965:31, 965:35, 965:43, 965:53, 965:61 and 965:66 to be obvious because of the

25  combination of Szlam and Yoshizawa.  The combination of Szlam with Yoshizawa is

26  not motivated, Szlam is not prior art, and the combination does not teach or suggest

27  the required combination of elements.  These questions of fact preclude summary

28  adjudication. Brody ¶ 110

KATZ'S OPPOSITION TO DEFENDANTS' MOTION          CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR SUMMARY JUDGMENT UNDER 102 & 103

a. **There Are Genuine Disputes of Fact Regarding Motivation to Combine Szlam with Yoshizawa**

A POSITA would never have thought of combining Yoshizawa with Szlam in the way required by the '965 claim. The context, goals and constraints of the two systems are very different.  Yoshizawa is a fully automated system in which a seasoned race track bettor who has learned the system, can quickly place a bet under tight time constraints by keying in a cryptic code for the bet he wishes to place.  The system then uses a voice response unit to translate the code he entered into Japanese and read it back to him to verify that what he coded is what he wanted.  He is given a time stamp and a registration code for each bet.  In the event he wishes to cancel a bet, he can use the registration code to identify to the automated system which bet he wants to cancel.  That system is completely foreign and inappropriate to Szlam, which teaches an operator-assisted system, with average consumers, with none of the urgent time pressures motivating Yoshizawa.  Brody ¶ 112.  Yoshizawa *teaches away* from using an operator, something required by the '965 patent:

> Similar systems include a … display system in which an operator intervenes when parimutuel tickets are purchased…. Hitachi, however, developed a….  system to sell parimutuel tickets *automatically by means of a voice response unit* [which] is the first attempt in Japan and in the world. Great expectations are placed on its achievement.

Yoshizawa at 215 (emphasis added).  Brody ¶ 112.  Dr. Brody thus disputes Dr. Prieve's claim (Prieve ¶ 141) that there is a motivation to combine these references because they "are substantially similar systems."  Brody ¶ 112.

Dr. Prieve states three times that the combination is motivated "based upon the express suggestion in Yoshizawa to incorporate the specialized outputs [of Yoshizawa] for an order entry application."  Prieve ¶¶ 139, 140, 143.  But he is wrong. Yoshizawa actually says that a *voice response unit* ("VRU") is a device that has many different applications, including order entry:

> In addition to the telephone betting system describe above *the voice response unit* can be applied to other fields using *its* special feature of outputting computer processing results in human voice. . . . Conceivable

20

applications include . . . order entry.

Yoshizawa at 220 (emphasis added).  There is no suggestion that any feature of the Yoshizawa *betting system* has anything to do with *order* entry.  The "special feature" is  the automated speech of the VRU, not the  features of the Yoshizawa system.  Brody ¶ 113.  A jury would  reject Dr. Prieve's conclusion due to his misleading and mistaken reading of Yoshizawa.

Dr. Prieve further alleges that it would have been obvious to combine Szlam's collection of "preliminary account information" with Yoshizawa's "transaction accounting" to create a more efficient "customer service" system.  Prieve ¶ 138.  Dr. Brody disputes this vague and unsupported assertion.  Brody ¶ 115.  Dr. Prieve does not explain what aspect of Yoshizawa's "transaction accounting" could be used in Szlam, how, or why.  Nor does he discuss what benefit might arise, if any.  In point of fact, the coded entry and read back system with registration numbers of Yoshizawa would be impractical to use in the customer service system described in Szlam.   A jury would agree with Dr. Brody that starting with Szlam and cherry picking features from Yoshizawa is just an application of hindsight improperly using these claims as a template.  Brody ¶¶ 114, 115

### b.    A POSITA Would Have No Motivation to Combine the Registration Numbers from Yoshizawa with the Operator Services of Szlam

| | |
|---|---|
| **965:31[8]** | generating computer acknowledgement numbers to identify the transaction for the system and individual callers and providing said computer acknowledgement numbers to the individual callers. |
| **965:35[9]** | providing computer generated acknowledgement numbers to said individual callers to identify transactions to the individual callers and the system. |

Defendants seek to combine Szlam's operator services with an acknowledgement number ("a number used by a caller to verify or acknowledge a transaction to the system").  Mem. at 19; Prieve ¶¶489-493, 700-704.  Dr. Prieve asserts, without explaining why, that "one of ordinary skill would be highly motivated

1  to modify the Szlam order entry system to include the specialized transaction output

2  feature" in the Yoshizawa system.  Prieve ¶139.  To the contrary, there is nothing to

3  suggest that the Szlam system would have been modified to include the registration

4  number scheme described in Yoshizawa.  Brody ¶ 117

5        Due to the time pressures so important in Yoshizawa, the bettor is given  a

6  registration code for every bet placed to be used in canceling the bet. The bettor can

7  quickly dial in, enter the code for a bet, and cancel it. With no operator in Yoshizawa,

8  there is really no other way to identify a bet. In Szlam, by contrast, there is no

9  corresponding time problem.  Also, in  Szlam the operator is looking at a screen

10  showing the customer's transactions without the need for registration numbers.

> When an operator becomes available . . . the operator terminal will then, as
> previously described, obtain the full customer account information from
> mainframe 16.  The operator can then conduct the necessary business with
> the customer.

14  Szlam at 12:60-66.  The Szlam system operators not only can cancel an order but also

15  obtain the reason for the cancellation - very valuable information for businesses.

16  Therefore, even considered as a feature in isolation, a POSITA would not be

17  motivated to look to Yoshizawa for a registration number. Defendants are simply

18  using hindsight, using these claims as templates, to find something in the prior art to

19  supply that feature.  There is no reason to believe a POSITA had any motivation to

20  graft Yoshizawa's unneeded race track betting system feature into the Szlam system.

21  Brody ¶ 118.

      **c.**    **A POSITA Would Have No Motivation to Combine the
Playback of Stored Data from Yoshizawa with the Order
Entry System of Szlam**

24  **'965:61[6]**   confirming with said individual caller, via the voice generator, certain of
said data stored in said file for said individual caller;

26        Defendants argue that it would have been obvious to incorporate the playback

27  of stored data described in Yoshizawa with the Szlam service system.  Mem. at 20;

28  Prieve ¶¶ 543-551.  But the play back system in Yoshizawa was necessitated by the

1  design needs of that context.  Without an operator, to cancel a bet the bettor must key

2  in the correct code.  There is a significant chance for error—the bettor might have

3  forgotten the registration number, or keyed it in wrong, or mixed up the registration

4  number for the bet he wishes to cancel with another bet.  So the system had to read

5  back the stored key identifying a bet to guard against mistakes.  Brody ¶ 119-120

6        There is no such problem in Szlam, which does not even discuss order

7  cancellation.  A POSITA would understand that in Szlam the caller would be

8  transferred to a live operator who can see the customer's account information and can

9  help the customer.

10        Once connected, the operator can then discuss the matter or reason for
   which the customer was called, for example, discussing a late payment
11        account, collecting on a delinquent account, verifying an order, updating
   customer account information, etc., while being directly connected, online,
12        to mainframe 16.

13  Szlam at 6:17-22.  So there is no reason to have an automated voice system read back

14  the account information.  And it would be irksome, because it would have to read *all*

15  the details—the system would not know which detail, if any, the caller wanted to

16  know.  Instead of that cumbersome graft from Yoshizawa, the Szlam operator would

17  just ask what the caller wants to know, or which part of an order he wants to cancel.

18  There is thus no motivation to combine these disparate systems.  Brody ¶ 121.

19        **d.    A POSITA Would Have No Motivation to Combine the**
20        **Coded Betting Information System from Yoshizawa with**
21        **Order Entry System of Szlam**

22  **'965:61[5]**   processing the other data for the individual caller utilizing multiple
            comparative operations;

23  
24        Defendants are also incorrect that Yoshizawa's coded system for placing bets

25  would meet this '965:61[5]'s requirement of multiple comparison operations, and that

26  it would be obvious to graft this feature into the Szlam operator services system. Mem.

27  at 20-21; Prieve ¶¶ 528-542.  The coded entry that Yoshizawa teaches is inappropriate

28  for a customer service system.  Yoshizawa requires the user to know how to key in a

1   code such as "09115010" in the correct order and format to designate the desired horse

2   race for the bet, whether he is betting for a win, place or "E.O" Forecast; the horse

3   number/set number and the number of tickets. *See*, Yoshizawa p. 217, Table 1.  This

4   sequence of digits is then decoded by the system and read back to the bettor using the

5   voice generator.  Ordinary consumers in the Szlam system, wishing to buy some socks

6   or check on their account, would find such a system baffling and so this would be

7   unsuitable for use in the Szlam system and thus there is no motivation to combine.

8   Brody 114, 122.

9              **3.    Summary judgment of obviousness of claim 31 must be denied**

10             **because Szlam and Yoshizawa together do not teach the**

11             **requirements of claim 31**

12             **a.    Limitation '965:31[6] Is Not Taught by Yoshizawa and**
                  **Szlam**

13   **'965:31[6]**   recording said caller number identification signals from said
14                communication facility as additional data for said individual caller;

15            Claim 31 requires that the "caller number identification signals *from said*

16   *communication facility*" (*i.e.*, the ANI signals) must be "recorded as additional data."

17   There is no mention in Yoshizawa of ANI, and no suggestion in Szlam that ANI

18   signals are "recorded as additional data."  Szlam says that when available ANI can be

19   used to obtain customer account information for a pre-existing customer.  But there is

20   no suggestion that the customer's telephone number is then "recorded" as "additional

21   data."  Indeed, there would be no reason to do so since it is already in the system.

22   Brody ¶ 123

23             **b.    The combination teaches away from using both ANI**
                  **('965:31[2]) and customer keyed in customer number**
24                **('965:31[4])**

25   **'965:31[2]**   receiving caller number identification signals indicative of at least a portion
26                of a caller's number from said communication facility;

27

28

                                          24

| | |
|---|---|
| **'965:31[4]** | selectively identifying said responsive signals from said select ones of said remote terminals as digital data signals or digital control signals, wherein certain of said responsive signals can serve as digital data signals, digital control signals, or both, said responsive signals including signals indicative of a customer identification number for the individual caller that may be utilized to access a file for said individual caller; testing at least a portion of said customer identification number for approval; |

Claim 31 requires a system that receives ANI *and* in which the caller keys in a customer number which used to access a file.  Neither Szlam nor Yoshizawa teach such a system, nor do the references suggest such a combination. Brody ¶ 124

Szlam teaches a system that can address two alternative situations:  In the first situation, when ANI is available, ANI is used to access the customer files.  The customer does not (and would not need to) key in a customer number that is used to access a file.  In the second, and only when ANI is *not* available, does the Szlam system permit the customer to key in a customer number that is used to access the customer's files.  In neither alternative is there both ANI and a keyed in customer number used to access a file as required by claim 31.  Meanwhile, Yoshizawa does not use ANI at all.  Thus, it clearly cannot teach or suggest the combination of ANI and a keyed-in customer number used to access a file.  Brody ¶ 125

As a result, looking at both systems together would not suggest the required combination of elements.  Instead, Szlam teaches away from doing so, since the keyed-in customer number is used as an alternative to the use of ANI to access the file. There is thus no motivation or suggestion for why one would use both. Brody ¶ 125

### 4. Claim '965:53 Is Not Rendered Obvious by Barger and Yoshizawa

| | |
|---|---|
| **965:53[9]** | providing computer generated acknowledgement numbers to said individual callers to identify transactions to the individual callers and the system. |

Dr. Brody disputes the notion that a POSITA would even think of combining these references because the context, goals and constraints of the two systems are very different.  The particularized Yoshizawa system described above –designed to meet

25

the time constraints of last minute bets using a fully automated system – is utterly foreign to the Barger situation, where a caller may leisurely listen to one or more music selections and after each one, may choose to buy it.  Barger has no need for a registration code to permit quick automated  cancellation of an order.   Furthermore, Barger's first embodiment requires operator assistance, whereas—as noted above, *see supra* § III.C.2.a—Yoshizawa *teaches away* from using any operator at all, touting its fully automated system as an improvement over prior systems that provided operator assistance.   Brody ¶ 126-127

Dr. Prieve alleges that the combination is motivated "based upon the express suggestion in Yoshizawa to incorporate the specialized transaction outputs [of Yoshizawa] for an order entry application."  Prieve ¶¶172, 179.  As shown above, *see supra* § III.C.4, Yoshizawa does not say its *betting system* has anything to do with general order entry applications; just that a *voice response unit* can be used for  order entry.  Brody ¶ 128.

Dr. Prieve further claims that it would have been obvious "to incorporate the use of transaction (registration) numbers" from Yoshizawa "to enhance the service provided by the Barger system".  He claims this would "provide a more efficient voice response system with enhanced transaction accounting."  Prieve ¶ 170.  But, as Dr. Brody points out, the Yoshizawa registration number system is unnecessary to and would not enhance the Barger system.  In Barger a caller can listen to one or more music selections and, after each one, may choose to buy it.  Barger does not even discuss cancellation of orders. But Barger does state that orders are identified by a date and time and then later batch processed off line after the calls are concluded.  Barger 6:3-17.  Thus it would not be feasible to provide an order number to the caller as in Yoshizawa, because the order processing takes place when the caller is no longer on the line. Brody ¶ 129

Moreover, in Yoshizawa, with no operators associated with the system, entering numbers into the system with DTMF input is the only way to cancel the bet.   The

1  Barger system has operators that can not only cancel an order but also obtain the

2  reason for the cancellation, which is very valuable information for businesses.

3  Therefore, even considered as a feature in isolation, a POSITA would not be

4  motivated to look to Yoshizawa for a registration number. Brody ¶ 130

### D.    Triable Factual Disputes Preclude Summary Judgment that Claims 14, 18 and 36 of the '360 Patent Are Obvious

Defendants' obviousness argument as to claims '360:14, '360:18 and '360:36

relies on a combination of *four* very different systems.  As described above,

Yoshizawa describes a race track betting system.  The VCT 1987 reference is a

quarterly newsletter with several unrelated articles, including three upon which the

Defendants rely:  "1-800 Customer Service," "American Express . . . " and "Colorado

State University."  Each of these VCT articles describes a distinct system for,

respectively, customer service, credit card authorization for merchants and student

registration for college courses.  Together these articles still fail to teach crucial

elements of these claims, and combining this hodge-podge of disparate systems to

create a system with all the features required by these patents claims would not have

been obvious; indeed, it would have defied logic.  Brody ¶ 136.

### 1.    Limitations '360:13[3] and 360:13[5] Are Not Taught by Yoshizawa and VCT 1987

#### a.    Limitation '360:13[3] is not Taught

| 360:18[3] | receiving called terminal digital data (DNIS) signals . . . to identify the select operating format from a plurality of distinct operating formats; |
|---|---|

Limitation 360:18[3] requires using DNIS "to identify the select operating

format from a plurality of distinct operating formats." This plainly requires that there

be two or more distinct operating formats, and that DNIS be used to identify one of

them.  This feature is neither taught nor suggested by the combination upon which the

Defendants rely.  Brody ¶ 155

The use of DNIS is mentioned in VCT 1987 only in the 1-800 Customer Service and in the American Express articles.  In both cases, DNIS is described as being used to *route the incoming call to a department*.  The customer service article states:

> The DNIS codes associated with each 800 number are identified by the voice system and *directed to the appropriate department* before the call is even answered. The result is an efficient interface with an *existing telephone service* that enhances the economic benefits of T1

VCT 1987 at 1, 6. Similar language appears in the American Express article:

> Based on these codes [DNIS] the voice system will instruct the ACD to *route the call to the appropriate department*.

*Id.* at 4.  A person of ordinary skill would understand these passages to describe using the VCT voice system in an existing telephone service that may have operator banks for sales or corporate accounts, and using DNIS to instruct the ACD how to handle and route calls to various agents or operators in different departments. These passages make no reference to using DNIS to select from multiple formats.  Brody ¶ 156

Tellingly, the following sentence is the sole support for Dr. Prieve's assertion that the article teaches using DNIS to select from multiple formats:

> DNIS codes received with each call allow the voice response system to identify the application before even speaking with the customer.

Prieve ¶ 747 (quoting VCT at 1, 6).  Dr. Prieve incorrectly equates the word "application" in the VCT 1987 article with a "format" as defined in this case.  The word "application" in VCT 1987 refers to how the call will be handled by the ACD and other systems.  For example, the ACD could put sales calls into a queue for the sales department.  And a sales agent may have a sales process that he or she follows and possibly sales entry software running on a terminal or other computer system. The word "application" in this article has nothing to do with a "format" as construed in this action.  Brody ¶ 157. There is at least a genuine dispute of fact whether this claim element, which is required by claims 14, 18 and 36, is taught by the combination.

### b.      Limitation '360:13[5] is not Taught

> **360:18[5]     receiving customer number data entered by a caller and storing the customer number data in a memory and further based on a condition coupling an incoming call to the operator terminal**;

Defendants fail to explain how any of these references satisfy the requirement that the customer number data keyed in by the customer is then stored.  In "1-800 Customer Service", "Colorado State University" and Yoshizawa, there is reference to a customer keying in a customer number.  In each case, the customer number is tested against already stored data to verify that what the customer keyed in is valid.  There is no suggestion that these systems then store in a memory what the caller keyed in,  and there would be no reason to do so since the customer number must already be stored.  In Yoshizawa, it is made clear that the customer must have previously opened an account and obtained an account number that was stored at that time "as part of the off line tasks".  Yoshizawa p. 219, left column.  But when setting up the account there is no reason to believe that the number was keyed in by the caller, because the account number was *given* to the customer at that time.  Brody ¶ 158.

### 2.      A POSITA Would Have No Motivation to Combine Yoshizawa and VCT 1987

#### a.      Defendants Fail to Identify a Motivation to Combine Yoshizawa and VCT 1987

Dr. Brody disputes Dr. Prieve's assertion that combining Yoshizawa and VCT 1987 is motivated because there are "*substantial similarities* between the *two* [*sic*: four] *telephone systems* . . . ."  Prieve ¶ 155.  To the contrary, the race track betting system of Yoshizawa had little in common with the credit card authorization, customer service and student registration  systems described in the VCT 1987. Brody ¶ 140.

Dr. Prieve's assertion that Yoshizawa provides an express suggestion to combine is wrong.  He incorrectly claims that Yoshizawa says that the Yoshizawa betting system can be applied to "credit card checking" or "information and sales

services."   Prieve ¶ 155  To the contrary, Yoshizawa says that a *VRU* is a device that has many different applications:

> This is not the only application of *the voice response unit.*  Other possible applications include information and sales services
>
> In addition to the telephone betting system described above, *the voice response unit* can be applied to other fields using its special feature of outputting computer processing results in human voice. . . . Conceivable applications include . . . credit card checking.

Yoshizawa at 220 (emphasis added). There is no suggestion that that the Yoshizawa race track system would have any utility for the other applications mentioned. Moreover, "sales services" in Yoshizawa is not a reference to *customer services,* as Dr. Prieve erroneously asserts.  Brody ¶ 138.

　　　Dr. Brody also disputes Dr. Prieve's assertion, *see* Prieve ¶ 155, that a motivation to combine is presented because the authorization code in the American Express article could be substituted for the similar code in Yoshizawa.  Because Yoshizawa already has such a code, there is no reason that a skilled artisan would have looked to American Express for a different type of authorization code.  And in any event such a substitution provides absolutely no motivation for grafting into either system, or any of the other systems described in VCT 1987, the elements required by the claims at issue that are *missing* from those systems.  Brody ¶ 139.

　　　Dr. Brody also disputes Dr. Prieve's assertion that a POSITA would be motivated to "modify the VCT system [*sic*: systems] to include the specialized transaction output feature [of Yoshizawa] for its expected benefits."  Prieve ¶ 155. The different VCT 1987 articles would in no way benefit from the so called "specialized transaction output features" as they are described in Yoshizawa.  To the contrary, using the complex coded input and read back system—which are useful for the special needs of the race track betting system—would, in the context of the VCT 1987 systems, be cumbersome, slow and annoying to those customers awaiting action, while providing no substantive benefit.  Indeed, Defendants have not identified any

30

1  real-world system that has ever combined the Yoshizawa coded input system with any

2  of the applications described in VCT 1987.  Brody ¶ 141.

3        Dr. Brody further disputes Dr. Prieve's vague assertion that a POSITA would

4  have been motivated to "add the specific identification method disclosed in

5  Yoshizawa, that of the callers entering their identification data, to the VCT 1987

6  system [*sic*: systems]." Prieve ¶ 156.  To the contrary, there are reasons *not* to use the

7  Yoshizawa system in any system described in VCT 1987.  For example, there are

8  customer service applications where the benefit of requiring a password is outweighed

9  by the inconvenience to the caller.  And there would be no reason to require a

10  subscription number and a password when a merchant is checking credit.  The student

11  registration system already describes two forms of identification,  so there would be

12  no point in substituting the Yoshizawa features.  And, the customer service article in

13  VCT 1987 *teaches away* from using such identification data when ANI is also

14  required as in claim 18.  Brody ¶ 142.

15        Finally, Dr. Brody disputes Dr. Prieve's assertion that "the combined features

16  perform the same function in combination as they did alone, yielding the predictable,

17  obvious result of the combination." Prieve ¶ 155.  Both the combination of these

18  particular features and their particular suitability for a range of specific tasks was

19  unpredictable. Brody ¶ 141.

20           **b.   A POSITA Would Have No Motivation to Add Any Other**

21                 **References to Yoshizawa or Colorado State University to**

                **Produce Limitations '360:13[3], '360:13[4], '360:13[5],**

22                 **'360:13[6], '360:13[7] or '360:14[9]**

| | |
|---|---|
| **'360:13[3]** | receiving called terminal digital data (DNIS) signals . . . to identify the select operating format from a plurality of distinct operating formats; |
| **'360:13[4]** | providing an operator terminal . . . |
| **'360:13[5]** | . . . based on a condition coupling an incoming call to the operator terminal; |
| **'360:13[6]** | visually displaying the customer number data at the operator terminal |

| | |
|---|---|
| '360:13[7] | updating data relating to the caller in the memory by incorporating other data entries provided at the operator terminal. |
| '360:18[9] | receiving caller telephone number data automatically provided by the telephone facility . . . . |

Yoshizawa describes a single-format system where pre-registered subscribers may place horse racing wagers over the phone with an automated system.  The system requires a subscriber number and a password before permitting the caller to place a wager.  The system repeats back to the caller the wager information entered and provides a registration number.  Brody ¶ 143.

"Colorado State University" describes a student registration system wherein a student enters his social security number and a personal access number, and then is permitted to key in data to select classes and grading options.  Brody ¶ 144.

Defendants provide no explanation why it would have been obvious to combine either of these fully automated single format systems with other VCT 1987 systems to add (1) DNIS, (2) providing an operator terminal, (3) visual display of data to an operator, (4) transferring the call to an operator, or (5) entry of data by an operator, each of which is required by claims '360:14, '360:18 and '360:36, nor (6) the use of ANI, as required by claim '360:18.  Brody ¶ 145.

On the other hand, Dr. Brody explains why it would not be obvious to do so. First, the articles VCT 1987 describe such different systems that there would be no reason to expect that features of one system would be appropriate for another. Moreover, the point of both Yoshizawa and Colorado State University is to completely do away with the requirement of an operator.  Therefore, they both teach away from systems in VCT 1987 that require transfer to an operator, visual display to an operator, and entry of data by an operator.  Also, because there is only one format described in each of these articles, there would be no reason at all to use DNIS to select among multiple formats. Brody ¶ 146.

These articles teach away from using ANI, which is required by claim 18.  The abstract in Yoshizawa touts the fact that the system allows the bettor to place his bet "through any push button telephone set, in a private home, or on a street corner." Similarly, the student in Colorado State may register from any available telephone. As described in detail above, ANI is particularly inappropriate to identify student callers because they change telephone numbers frequently, tend to share telephone numbers, tend to call locally and often from within the campus switchboard.  Thus both Yoshizawa and Colorado State teach away from using ANI, and instead the caller identifies himself by entering his identification number.  Brody ¶ 147.

Each consideration provides an ample basis for a jury finding that modifying either the Yoshizawa system or the Colorado State University system in these multiple ways would not have been obvious.

### c. A POSITA Would Have No Motivation to Modify VCT 1987's "1-800 Customer Service" to Meet the Limitations of '360:18[3], '360:18[5], '360:18[8] and '360:18[9]

| | |
|---|---|
| **'360:13[3]** | receiving called terminal digital data (DNIS) signals . . . to identify the select operating format from a plurality of distinct operating formats; |
| **360:13[5]** | . . . receiving customer number data entered by a caller . . . |
| **'360:14[8]** | . . . developing computer generated number data; |
| **360:18[9]** | receiving caller telephone number data automatically provided by the telephone facility. |

"1-800-Customer Service" describes several ways to implement a single-format customer service system.  One is to have a customer key in data to identify himself which is used to retrieve customer data for use by the agent.  Another uses ANI and not customer-entered identification to retrieve the customer data.  The article also mentions using the VCT Advantage system (VRU) to intercept calls before going to an automated call distributor (ACD), and using DNIS to instruct the ACD which department to route the call to.  Brody ¶ 148.

Defendants provide no explanation why it would have been obvious to modify either of the alternative 1-800-Customer Service systems to (1) use DNIS to select

33

from multiple formats or  (2) develop a computer generated number, as required by claim '360:14 and '360:18, nor (3) use ANI in addition to a customer number, as required by claim '360:18. Brody ¶ 149.

On the other hand, Dr. Brody explains why it would not be obvious to combine these features from Yoshizawa, or the other VCT 1987 systems.  First, the VCT 1987 articles and Yoshizawa describe such different systems that there would be no reason to expect that features of one system would be appropriate for another.  Moreover, in each of the customer service systems described in this article, there is just a single format.  So there would be no reason to use DNIS to select from multiple formats. Indeed, in the 1980s, the state of the art was (as reflected in VCT 1987) for companies to implement individual, stand-alone voice-response applications that met their particular needs, and companies like VCT sold such individual applications to specific industries that had specific needs (vertical market segments).  Brody ¶ 137.

This article actually teaches away from using both ANI and a customer number because the article teaches using one *or* the other as alternative ways of identifying customer information needed by the service agent.  And, there is no suggestion that a computer generated number would be useful or desirable.  In Yoshizawa, the computer generated number is a registration code for each bet placed, and is needed for rapid cancellation of a specific bet using the automated system.  There is no such concern in simply providing customer service that would motivate such a modification to the described system.  Brody ¶ 150.

**d. A POSITA Would Have No Motivation to Modify the VCT 1987's "American Express . . ." System to Meet Limitations '360:14[3], '360:14[5], '360:14[7], '360:14[8] and '360:14[9]**

**'360:14[3]** receiving called terminal digital data (DNIS) signals . . . to identify the select operating format from a plurality of distinct operating formats;

**'360:14[7]** updating data relating to the caller in the memory by incorporating other data entries provided at the operator terminal;

**'360:14[8]** . . . developing computer generated number data . . .

**'360:14[5]**   . . . receiving customer number data entered by a caller . . . and

**360:14[9]**    receiving caller telephone number data automatically provided by the telephone facility . . . .

The VCT 1987's "American Express . . ." describes a system used to handle credit card authorization calls by merchants.  Based on DNIS, the "voice system will instruct the ACD to route the call to the appropriate department." All credit card calls are sent to an operator who keys in data provided by the merchant.  When finished, the operator can switch the call to a VRU that can speak an authorization code to the caller. Brody ¶ 151.

The American Express article fails to teach (1) limitation 360:14[3], using DNIS to select among distinct formats , (2) limitation 360:14[7], conditional transfer to an operator , or (3) limitation 360:14[8], caller entry of a customer number. Furthermore, it teaches against (4) use of ANI in addition to the customer number, as required by limitations 360:18[5] and 360:18[9]. Brody ¶ 152.

Dr. Brody explains why it would not be obvious to combine these references to supply these missing features.  First, the VCT 1987 articles and Yoshizawa describe such different systems that there would be no reason to expect that features of one system would be appropriate for another.  Moreover, the American Express article says that DNIS is used to route to a department (and thus an operator). This article does not discuss a multiple-format system, so there would be no reason to use DNIS to select among multiple formats nor selecting a format with DNIS.  Brody ¶ 153.

Similarly it would have been nonobvious—and even counterintuitive—to require both ANI *and* a customer number (neither of which is mentioned in the article).  As discussed above, the 1-800-Customer Services article teaches away from doing so.  Finally, in this article all credit card calls are routed either to the operator, or the merchants can "complete the entire transaction by entering the data on their telephone keypad". So there would be no reason to provide for a *conditional* transfer to an operator as required.  Brody ¶ 154.

35

### E.     Triable Issue of Fact Prevent Summary Judgment as to Claim 5 of the '223 Patent

#### 1.     Reese is Not Prior Art to the '223 Patent

As an initial matter, to rely on Reese as prior art, Defendants must show that Mr. Katz did not conceive the invention of '223:5 and diligently reduce it to practice prior to the August 28, 1989 filing date for Reese. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996). But, as Mr. Katz explains in his Declaration, he conceived of the invention of claim 5 of the '223 prior to March, 1989, and further reduced the invention to practice in a public, commercial embodiment by March, 1989, long before Reese's filing date of August 29, 1989. *See* Katz ¶¶ 1-9. This is substantial evidence that Mr. Katz' conception of the '223:5 invention pre-dates the August 28, 1989 filing date of the Reese patent. Katz ¶¶ 1-9. Accordingly, Defendants may not rely on Reese as prior art to the '223:5 at the summary judgment stage of the proceedings.

#### 2.     A POSITA Would Have No Motivation to Combine Friedes and Reese.

Even if Reese were prior art, a POSITA would have had no motivation to combine the teachings of these two references. Brody ¶ ¶ 159-164. Reese describes an automated Lotto system that callers can reach via a 900-number call mode and an area-code call mode, but *not* a toll-free call mode. Brody ¶ 160. Defendants erroneously contend that a skilled artisan would have been motivated to combine Reese with the Friedes description of a toll-free call mode. Defs. Br. at 25. To the contrary, the goals and means of Reese teach away from the use of a toll-free call mode, and the skilled artisan would have no reason to make such a combination. Brody ¶¶ 161-162.

Defendants ignore a fundamental purpose of the Reese lottery: "to provide State Lottery Commissions and Agencies with a *revenue producing* enhanced service." Reese at 2:16-18 (emphasis added). A major focus of Reese is describing an efficient system for ensuring that callers will be *charged* for their lottery purchase, either

36

1   through 900-number billing arrangements or credit card charges for the area-code

2   mode.  In one disclosed mode, callers would dial a regular area-code number (e.g.,

3   213-123-4567), pay for that call as part of their regular telephone service, and then

4   enter credit card information to pay for the Lotto entries.  *See id.* at Fig. 1 & 3:59-4:53.

5   In the second disclosed mode, the caller uses a 900-number to reach the Lotto system,

6   and the telephone company "bills and collects from the lotto player via the lotto

7   player's office or residence monthly telephone statement a fixed dollar amount for the

8   purchase of the lotto selection and a fixed line fee for using the 900 inward calling

9   phone number."  *Id.* at 5:9-14; Brody ¶ 161.

10      It would be entirely antithetical to the Reese system to offer lotto players access

11   via the "toll-free" calling system described in Friedes.  The State Lottery Commissions

12   or Agency would have had to *pay* for each toll-free call from a lotto player to the

13   Reese system.  Brody ¶ 162.  This flies in the face of Reese's focus on revenue

14   generation, and would have undermined Reese's stated purpose of providing a *revenue*

15   *producing* enhanced service."  *Id.*  Accordingly, a skilled artisan would have had no

16   motivation to combine the Reese and Friedes references.[5]

17      Dr. Prieve argues that a person skilled in the art would have been motivated to

18   combine Friedes and Reese in order to further Reese's purpose of allowing lotto

19   players "'from one state to participate in a lotto game in another state.'"  Prieve ¶ 159

20   (citing Reese 2:8-11).  But this is incorrect.  Reese had no need to add toll-free service

21   to his invention, because callers from anywhere in the United States could already

22   reach his automated lotto system using either the area code number or the "900"

23   number disclosed in the Reese patent (and could do so without incurring cost for the

24   operator of the lotto system).  Brody ¶ 163.

25

26

---

27   [5] Notably, the Defendants, in their second Memorandum in Support of Collective
     Motion for Judgment of Patent Invalidity as a Matter of Law at 11, recognized that 800
28   numbers are the "reverse" of 900 numbers, and have antithetical purposes.

1    Dr. Prieve is equally incorrect that a skilled artisan would have been motivated

2 to combine Friedes and Reese in order to take advantage of Friedes' capability of

3 disclosing the dialed number.  Prieve Dec. ¶¶ 160-61.  First, Defendants offer

4 absolutely no evidence that persons skilled in the art were unsatisfied with Reese's

5 disclosed method of securing payment from either a credit card or a "900" billing

6 arrangement.  In the absence of such dissatisfaction, a skilled artisan would have had

7 no reason to look to Friedes or any other reference.  Brody ¶ 164.

8        **3.      The Combination of Reese and Friedes Does Not Teach the Specific Means-Plus-Function Structures Required by '223:5**

9

10   | '223:5[2] | means for selectively receiving calls from said multitude of terminals to establish telephone communications with a select subset of callers. . . . |
     |---|---|

11   Limitation '223:5[2] is written in means-plus-format format and, as such,

12 requires the use of the specific structure disclosed in the '223 as corresponding to the

13 function of "selectively receiving calls from said multitude of terminals to establish

14 telephone communications," *viz:* control unit 28 and at least any two of the following:

15 (1) audio response unit 18 and free-call memory 32, (2) audio response unit 20 and

16 select-number coincidence detector 34, and (3) audio response unit 22.  *See* Brody

17 ¶ 166.  Neither Reese nor Friedes (nor both) disclose these specific structures.  *Id.*

18   Defendants assert that Friedes discloses the means for selectively receiving

19 when, in a single very vague passage, it notes that customers of the Friedes "toll free"

20 system might choose to receive ANI signals over an ISDN "B-channel" prior to

21 establishing voice communications, and could perform a "validation check" to

22 "determine whether or not to establish a voice path at all (screening out the

23 'hackers')."  Prieve ¶¶ 840-41.  But this passage fails entirely to disclose the specific

24 structural elements required by '223:5[2], and is so general that it would not have

25 disclosed those structures even to one skilled in the art.  *See* Brody ¶ 167.

26

27

28

**F.     Triable Issues of Fact Preclude Summary Judgment Invalidating Claims 69, 85 and 92 of the '707 Patent**

As an initial matter, while the defendants take pains to tell this Court that certain of the claims here at issue are currently in the reexamination process, they fail to mention that each of the '707 claims they allege are invalid were actually reexamined *and confirmed*.  Brody ¶168.  The burden of invalidating claims is "made heavier" when the claims have gone through reexamination.  *Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955, 961 (Fed. Cir. 1986); *see also In re Opprecht*, 868 F.2d 1264, 1265 (Fed. Cir. 1989) ("[Courts] give great weight to the outcome of reexamination.  Such a situation does not conflict with, and indeed reflects, the statutory purpose.").

**1.     Limitation '707:69[2] Is Not Taught by McFiggins and Duwel**

| '707:69[2] | providing products carrying participation numbers specifying limits on use to entitle individual callers to access said operations of the interface with said telephone communication system |
|---|---|
| '707:69[5] | qualifying said individual callers by testing to determine if said individual are entitled to access said operations of the interface based on said limits on use specified by said participation numbers for said individual callers and accordingly providing approval signals for qualified individual callers |

**a.     Neither McFiggins Nor Duwel  Discloses "products carrying participation numbers"**

Defendants identify the dynamically generated authorization code from Duwel as a "participation number[]" (*Id.* ¶ 892) but fail to establish that the meter is provided carrying  this alleged participation number, as required by the claim.  Brody ¶ 169.  The Duwel postage meter dynamically generates a new authorization code for each use, which generation is inherently transitory.  *See* Duwel at 5:22-29.  Moreover, the code does not exist until the user puts in information, so the supplier in Duwel  cannot be said to be "providing products carrying participation numbers" as required.  Brody ¶ 169.

In McFiggins, the defendants identify the meter number of the postage meter as the "participation number[]," *see id.* ¶ 887.  The reference nowhere states that such a

39

1  number is actually "carried" by the meter.  It could have been supplied separately,

2  provided in the packaging, in the documentation, or otherwise.  *See* Brody ¶ 169.

3            **b.**     **Neither McFiggins Nor Duwel Disclose "participation**

4                    **numbers specifying limits on use to entitle individual callers to access said operations of the interface"**

5      This Court defined a "limit on use" as follows:

6      a control that limits a caller's access to a service based on some

7      predetermined method of measuring the level of use.  *Order Re: Claim Constr.* at 20.

8  As noted above, Defendants allege that the postage meter number of McFiggins, or the

9  authorization code of Duwel, constitutes the participation number.  However, even

10  assuming this is true, neither reference discloses that said numbers "specif[y] limits on

11  use to entitle individual callers to access said operations of the interface."

12      With regard to McFiggins, Defendants allege that "each *meter number* can only

13  be used a fixed number of times (for example 500) . . . ."  Prieve ¶ 888 (emphasis

14  added).  But the alleged use limitation relates to one embodiment wherein the meter

15  holds a set number of codes on a perforated piece of paper tape stored in the meter.

16  *See* McFiggins at 8:22-35. On each recharge, the user enters, *inter alia,* the meter

17  number and receives the next code number which is keyed into the meter.  If it

18  matches the next code number stored in the meter, the meter is recharged.  Each time

19  the user calls in to the system, it determines whether there is at least one combination

20  remaining and, if so, provides the next combination.   McFiggins at 8:34-35.Brody ¶

21  172.  Because the limitations of paper-tape memory at the time, the meter only holds

22  500 code numbers so when the user gets to the end of that list, she must get a new set

23  of code numbers—which were freely available. McFiggins at 8:34-35. Then the user

24  *continues using the same meter number* as before.

25      The codes function to protect the integrity of the meter, preventing unpaid-for

26  postage usage, not limiting the caller's use of the automated system.  Brody ¶ 172.

27  Any limit on the number of available combinations is an unintended artifact of limited

28  memory and computing power in the meter, not an intent to limit access to the

telephonic system.  Brody ¶ 173. In fact, McFiggins clearly viewed the need for paper tapes, with this limited code list, as an encumbrance, and thus *taught away from its use*:

> It is understood that the random number generation method used in calculating each combination of random sequence (sub-routine 96) [by the central office] is also used in preparing the punched paper tape . . . . [¶]*It will be appreciated that the combination locks may be equipped with micro-computers using the same random number generation method to calculate the new combinations in concert with sub-routine 96.*

*Id.* at 9:53-67 (emphasis added).

In short, the data center uses a random number generator to create the paper tape in advance, and thereafter to determine the correct combination at the instant of each use.  Here McFiggins explained that there could be parallel random number generators ("micro computers using the same random number generation method") at both the data center *and* the postage meter – which would eliminate the cumbersome process of exchanging the paper tape.  Clearly, the limited number of combinations is an artifact of the limits of technology of the time, not related to the actual use of the system nor any interest in limiting the user's ability to add value to the meter.  Brody ¶ 173.  Thus McFiggins does not teach or suggest using a participation number to limit access to an automated telephone system.

Duwel supports this notion:  Given the advancement in computing power between 1974 (McFiggins) and 1984 (Duwel), Duwel teaches that the postage meter dynamically generates an authorization code, which code is decrypted by the data center to determine the reset value and postage meter readings.  Duwel at 4:34-40, 5:22-6:1; Fig. 1.  The data center then generates an encrypted response for the user to enter into the meter, *id.* at 6:34-41, which number serves both to unlock the meter and add value thereto.  This obviates the need for the paper tape, which Pitney-Bowes (the assignee of both the McFiggins and Duwel patents) clearly saw as unwieldy.  Simply, one of the principal benefits of Duwel was to get away from the limitation of the paper tape of McFiggins.  Brody ¶ 174.

1    As a further point on Duwel, the Defendants mistake the authorization code for

2    a "participation number specifying a limit on use."  Each time a user wishes to

3    recharge the postage meter disclosed in Duwel, he must enter the reset amount (*i.e.*,

4    the value to be added), which value—along with the meter's control sum register and

5    prestored seed number—is then applied to the encrypter to generate an authorization

6    code.  Duwel at 4:34-40 & Fig. 1.  The remote data center decrypts the authorization

7    code into its components and compares these against the stored information for that

8    meter.  *Id.* at 5:22-41.  There is no indication that the remote data center checks

9    whether a given authorization code has ever been used before; indeed, there would be

10   no reason to do so.  *See* Brody ¶ 175.  After all, the remote data center does not care

11   what the *number* is, so much as it uses the *components* that create the number to

12   determine whether to proceed with the request.  Duwel at 5:30-6:1.  The point of the

13   authorization code is that the remote data center decodes and matches the *data*.[6]

14   Using an authorization code for a second time would result in the system rejecting the

15   code for the same reason it rejects previously unused but *incorrect* codes—the code

16   does not match the data independent of any level of use.  Brody ¶ 175.

17           c.     **Neither McFiggins Nor Duwel teach "testing to determine**
18                  **if said individual callers are entitled to access said**
                    **operations of the interface" based on limits of use "for said**
19                  **individual callers."**

20   Moreover, neither McFiggins nor Duwel teach '707:69[5]'s requirement of

21   "testing to determine if said *individual callers*" are entitled to access the interface

22   "based on limits on use  . . . *for said individual callers*."  '707:69[5] (emphasis added).

23   The codes referred to in McFiggins and Duwel are directed to the integrity of the

24   *postage meter itself*; they have nothing to do with limiting the use of the *telephonic*

25   *system* by an *individual caller*.  Brody ¶ 171.  The supplier of the postage meters does

26   _____

27   [6] For example, if a credit card company provided each cardholder with a device which encrypted the card number each time the cardholder called in to the company's IVR, the encrypted number would not be a limit on use merely because it was unique.  Rather,
28   the underlying information—the card number—would remain static.

1  not care who calls the system, how often nor when.  Thus, the codes in question are

2  not limits on the use by "individual caller" to access the call-in format, but are instead

3  designed to prevent misuse of *the postage meter*.  *Id.*

4  In McFiggins, for example, the caller begins by entering an account number—a

5  number that undisputedly is *not* carried by the postage meter—and that account

6  number qualifies the caller for use of the system based on that account number.  *See*

7  McFiggins 4:33-43.  Once that qualification (which plainly does not invoke any limit

8  on use) is completed, the system has already determined that this "individual caller" is

9  permitted to use the system.  Any later limit based on a lookup of the particular meter

10  number thus has nothing to do with limiting "individual callers" access to the system;

11  it is simply an integrity check related to a particular postage meter.  *See* Brody ¶ 171.

## 2.   Limitation '707:69[7] Is Not Taught by McFiggins and Duwel

13  **'707:69[7]**    processing at least certain of said answer data responsive to said approval

14  signals

15  The *AT&T* court defined "processing" as follows:

16  manipulation of data which performs some operation or sequence of
operations on the data.

17  *RAKTL v. AT&T Corp.,* 63 F. Supp. 2d 583, 611 (E.D. Pa. 1999).  Thus,

18  limitation '707:69[7] requires manipulation of the answer data in response to the

19  approval signals.  With regard to McFiggins, Defendants identify the "answer data" as

20  the user's account number.  *See* Prieve ¶ 909.[7]  Defendants further identify the

21  "approval signals" as the "new combination [provided] to the caller."  *Id.* ¶ 917.

22  However, there is nothing in McFiggins to indicate that the answer data (*i.e.*, the

23  account number at block 40), which is the *first* thing entered by the user, is processed

24  "*responsive to said approval signals*," as the approval signals (*i.e.*, providing the new

25

26

---

27  [7] Defendants did not attempt to identify "answer data" from Duwel.  This is likely
because Duwel does not teach the entry of *any* data other than the authorization code.

28  Brody ¶ 177.

1    combination at block 118) is the *last* thing that happens in the system.   *See* McFiggins

2    at 4:23-27 & Fig. 2, block 42; 9:46-52 & Fig 2, block 118; Brody ¶ 177.

3                    **3.    Claim '707:85 Is Not Taught by McFiggins and Duwel**

4    | '707:85 | A process for controlling operations of an interface with a telephone communication system according to claim 69, wherein the step of providing products includes providing said products for purchase. |
5    | --- | --- |

6            Claim '707:85 adds the limitation that the product carrying a participation

7    number is a "product[] for purchase."  Dr. Prieve declares that "[i]t was well known in

8    the art that postage meters were provided for purchase."  Prieve ¶¶ 944-46.  This is

9    disputable at best.  Brody ¶ 178.  Dr. Prieve relied on "*A Swiss Postage Meter Puts Its*

10   *Stamp On The U.S.*" for this (hearsay) proposition, which article he attached to his

11   Declaration.  As is evident if one actually reads this article, however, postage meters

12   *are not provided for purchase*, but rather may only be *leased*:

13           [Pitney Bowes,] which owns more than 90% of the market and annually
14           rakes in an estimated $300 million from *rental* fees on its meters, clearly is
             taking notice of the new competition . . . .

15           The top-of-the-line model for high-volume mailrooms runs $3,295, plus a
16           *monthly fee* of $22 for the meter.

17   Prieve, Ex. 45 (emphasis added).  Indeed, that postage meters were only available for

18   lease, rather than sale, comports with U.S. law.  *See, e.g.*, 39 C.F.R. § 501.7(2)-(2)(1)

19   ("The provider must affix to all meters a cautionary message . . . as follows: . . .

20   RENTER POSTAGE METER-NOT FOR SALE."); *see also, e.g.*, Pitney Bowes, Inc.,

21   FAQs, *available at http://www.pitneyworks.com/meter/indexnt.*

22   *cfm?ml=W0107W0000W00B&mktpgm=A7AAARF6MC* (last visited on Apr. 11, 2008)

23   ("Can I buy the Personal Post instead of renting?  *No.  Only authorized postage meter*

24   *manufacturers and the U.S. Postal Service may hold title to meters*.") (emphasis

25   added).  Brody ¶ 178.

26

27

28

                                              44

### 4.   Claim '707:92 Is Not Taught by McFiggins and Duwel

| '707:92 | A process for controlling operations of an interface with a telephone communication system according to claim 69, wherein said limits on use specify limited numbers of uses. |
|---------|----------------------------------------------------------------------------------------------------------------------------------------------------------------|

Claim '707:92 adds the limitation that the limit on use specifies a "limited number of uses."  As noted above, *see supra* § III F.1.b., the supposed limit on use in McFiggins is a byproduct of the limitations of memory and computing power in the 1970s.  Indeed, McFiggins indicated that, if possible, one would do away with the encumbrance and instead use parallel random-number generators, thereby teaching away from the preference for a limited number of uses.  A POSITA would therefore try to avoid importing this restriction.  Brody ¶ 179.

As for Duwel, the authorization code does not limit the number of times one may access the system.  Rather, one may access the system an infinite number of times.  Simply, it is the unique circumstances of combining the reset amount, control sum register and prestored seed number which creates a given authorization code; the user, however, may access the system as many times as he wishes by generating a new code.  Brody ¶¶ 175, 179.  Further, the telephonic system neither checks for nor cares whether a new code is used; rather, the system simply determines whether the components are valid.  Brody ¶ 180.

## IV.   THE EVIDENCE SHOWING OBJECTIVE INDICIA OF NON-OBVIOUSNESS CREATES A TRIABLE ISSUE OF FACT PRECLUDING SUMMARY JUDGMENT

As the *KSR* Court reaffirmed, the so called "secondary considerations" of non-obviousness remain vital.  *KSR*, 127 S. Ct. at 1730.  These considerations are "not just a cumulative or confirmatory part of the obviousness calculus but constitute[] independent evidence of non-obviousness," *Ortho-McNeil Pharm.*, 2008 WL 834402, *5, and "must be considered before the issue of patent obviousness can be determined on a motion for summary judgment," *Ryko Mfg. Co. v. Nu-Star, Inc.*, 18 U.S.P.Q.2d 1047, 1048 (D. Minn. 1990), *aff'd*, 950 F.2d 714 (Fed. Cir. 1991).  In fact, they "may

45

Case 2:07-cv-02192-RGK -FFM   Document 270   Filed 04/29/08   Page 53 of 57   Page ID #:8579

often be the most probative and cogent evidence [of nonobviousness] in the record," *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983), as they may "establish that an invention appearing to have been obvious in light of the prior art was not," *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988).  Here, the secondary considerations weigh heavily against any summary resolution of obviousness:

### A.    Long-Felt Need

Long-felt need is another one of the particular considerations specifically identified in *Graham*, as reaffirmed in *KSR*.  *See Graham*, 383 U.S. 1, 17-18; *KSR*, 127 S. Ct. at 1730.  As Judge Hand wrote, "the length of time in the art, though needing the invention, went without it," may be the best nontechnical guidepost for inferring nonobviousness.  *Safety Car Heating & Lighting Co. v. General Elec. Co.*, 155 F.2d 937, 939 (2d Cir. 1946).

Prior to the introduction of the inventions claimed in the patents-in-suit, commercial industries implementing interactive telephony based services experienced long-felt needs to provide automated, secure, efficient, feature-rich, and cost-effective interactive telephony services to large numbers of customers and other callers.  Brody ¶¶ 38-55.  The problem before the Katz patents was to identify efficient methods of using both systems and operators, given the myriad of functions, technologies and options available.  See Andrew Waite, *Getting Personal with New Technologies for Telemarketers* ("[T]he obvious tools inherent to most of these systems – such as call prompting … are endless."); Brody ¶ 53.  The rapid and widespread adoption and deployment of the inventions throughout various industries, including deployment by licensees to the Katz portfolio and the Defendants against whom Katz patents have been asserted, demonstrates that the inventions have met this long-felt need.  Brody ¶¶ 56-73.

Indeed, the very fact that there are so many licensed systems indicates that there is a benefit to using the Katz system—companies would not license (in other words,

46

FOR SUMMARY JUDGMENT UNDER 102 & 103

CASE NO. 07-ML-01816-B-RGK (FFMx)

1  infringe but for the patentee's permission) unless the value of using it exceeds the cost

2  of the license.

3    **B.    Commercial Acquiescence**

4    Commercial acquiescence—*i.e.*, licensing—within an industry is "very weighty

5  evidence to sustain the presumption" of validity.  *Eibel Process Co. v. Minnesota &*

6  *Ontario Paper Co.*, 261 U.S. 45, 56 (1923); *see also, e.g.*, *Minnesota Mining & Mfg.*

7  *Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1575 (Fed. Cir. 1992)

8  (noting, where a major competitor licensed the patent, that "such real world

9  considerations provide a colorful picture of the state of the art, what was known by

10  those in the art, and a solid evidentiary foundation on which to rest a nonobviousness

11  determination").  "It is not necessary . . . that the patented invention be solely

12  responsible for the commercial success, in order for this factor to be given weight

13  appropriate to the evidence." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264,

14  1273 (Fed. Cir. 1991) (reversing district court's decision to invalidate as obvious the

15  patent on summary judgment).  A *litigant's* decision to license the patents in suit is

16  particularly telling.  *B & H Mfg. Inc. v. Foster-Forbes Glass Co.*, 26 U.S.P.Q.2d 1066,

17  1070 (N.D. Ind. 1993) ("Even with the high cost of patent litigation, few (if any) large

18  competitors will pay millions of dollars in royalties simply to avoid litigation.").

19    One cannot reasonably dispute that the Katz patent portfolio—including each of

20  the six patents Defendants seek to invalidate by their Motion—has been successfully

21  and extensively licensed within a wide range of industries.  Indeed, as is evident from

22  Katz's response to the Defendants' Common Interrogatory No. 9, Katz has licensed its

23  portfolio to over 200 entities for fees well in excess of *$1.2 billion*, plus running

24  royalties.  Tramontana ¶¶ 2-3.  Many of the licenses were purchased after specific patent

25  claims were identified to, or discussed with, the prospective licensee in connection with

26  certain services or operations, including asserted claims and accused services identified

27  during litigation.  For example, claim '120:57, Katz ¶ 10; *id.* Ex. 3 at

28  NEWKTL0016657; claims '863:96 and '863:98, Katz ¶¶ 10-11; *id.* Exs. 3 at

47

NEWKTL0016657 & 4 at NEWKTL0050792; claims '965:35, 965:43 and '965:53, Katz ¶ 12; *id.* Ex. 5 at KTL0372747; and claims '707:69, 707:85 and '707:92, *see* Katz ¶¶ 13-14; *id.* Exs. 6 at KTL00519214 & 7 at NEWKTL0017019, were each—either directly or through the independent claims upon which they rely[8]—identified to companies as claims they infringed before these companies agreed to license the Katz portfolio.

Similarly, the claims at issue here are the same as those asserted in prior litigation, which litigation resulted in licenses:

| Litigation | C | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T | | | | | | | | | | | | | | | |
| Verizon | | | | | | | | | | | | | | | |
| CitiBank | | | | | | | | | | | | | | | |

*See* Martiniak Exs. 1-3; *RAKTL v. AT&T Corp.*, Pls' Supp. Initial Disclosures at 3, 4, 6.[9]

Perhaps most tellingly, more than forty former litigants, *including many of the moving Defendants' former co-Defendants*, quit their cases and licensed the patents after having the  same claims asserted against them.[10]  That these  litigants, with the

---

[8] Of course, if an independent claim is valid, then the dependent claims which rely upon it are equally valid.  Thus, for example, when Katz discussed with Principal Financial Group the '965:34, this is no different from discussing the dependent claims which rely upon it, such as the '965:35, '965:43 and '965:53.  Katz Ex. 5 at KTL00372747.

Notably, in many instances, Katz discussed not only the independent claim, but also explicitly discussed the dependent claims, including in particular several of the ones at issue in this Motion.  *See, e.g.*,  Katz Ex. 7 at NEWKTL0017017-19.

[9] The chart identifies reliance upon the independent claim bases for the claims here at issue by use of an *italicized "X"*.

[10] The former defendants who have settled include Alltel Corporation, AT&T Corp., Avon Products, Inc., Cellco Partnership d/b/a Verizon Wireless, Ceridian Corporation, Chevron, Citigroup Inc., Consolidated Edison Co. of N.Y., Inc., Continental Airlines, Inc., Cricket Communications, Inc., Cullen/Frost Bankers, Inc., and The Frost National Bank, Discover Financial Services, DTE Energy Company, Express Scripts, Inc., Ford Motor Company, GMAC, LLC, Hilton Hotels Corporation, IDT Corporation, Inventions, Inc. (Szlam), LaSalle Bank Corporation, Lucent Technologies Inc., M & T

48

financial and legal resources at their disposal, opted to settle is strong evidence of the validity of these claims.  See Martiniak Ex. 4 at Response to Interrogatory No. 9; *see e.g.*, *B & H Mfg.*, 26 U.S.P.Q.2d at 1070 ([The licensees, who were former litigants] have been represented to the court to be the most powerful … companies [in this industry] in the country, which leads the court to believe that they would not have bowed to pressure to take a license without first reaching the conclusion that ultimately litigation would prove futile.")

### C.   Commercial Success

Commercial success is another long-recognized objective indication of nonobviousness.  *See, e.g.*, *Smith v. Goodyear Dental*, 93 U.S. (3 Otto) 486 (1876); *Graham*, 383 U.S. 1, 17-18; *KSR*, 127 S. Ct. at 1730; *see also Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988) ("The commercial response to an invention is significant to determinations of obviousness, and is entitled to fair weight.").  There should be a nexus between the claims at issue and the market success.  However, "if the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus."  *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).  When the burden so shifts, "[i]t is thus the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc. . . . '[A]rgument' and 'conjecture' are insufficient . . . ."  *Demarco*, 851 F.2d 1393.

Bank Corp., Morgan Stanley, Old National Bancorp, PacificCorp, PetMed Express, Inc., Progress Energy, Inc., Regions Financial Corporation, Safeco Corporation, Safeway, Inc., Sierra Pacific Resources, Target Corporation, The Jean Coutu Group (PJC) USA, Inc., The PNC Financial Services Group, Inc., TracFone Wireless, Inc., United Air Lines, Inc., United National Corporation, Universal Card Services Corp., Verizon California and its Affiliates, Wal-Mart Stores, Inc., Well Point, Inc., West Interactive Corporation, and Zions Bancorporation.  Tramontana ¶ 2.

Mr. Katz first partnered with American Express in 1988 to establish FDR Interactive Technologies, Inc., which later conducted business under the name of Call Interactive.[11]  These businesses provided interactive call processing services based on Mr. Katz's inventions.  Mr. Katz continued to provide consulting services to Call Interactive until 1992.  While at First Data and Call Interactive, Mr. Katz contributed to, conceived of, and/or oversaw the implementation of many of the functionalities and features claimed in the Katz patent portfolio.  Katz ¶ 15.

As is evident, the Katz patents were embodied in successful commercial ventures by First Data and/or Call Interactive.  *See* Tramontana Ex. 1 at Response to Interrogatories No. 8; Kuyper ¶¶ 3-9.

V.   CONCLUSION

The Court should deny defendants motion for summary judgment for all the reasons described above.

April 29, 2008                          HELLER EHRMAN LLP


                                        By     \s\ *Robert T. Haslam*
                                        ────────────────────────────
                                             ROBERT T. HASLAM
                                          Attorneys for Plaintiff RONALD A. KATZ
                                          TECHNOLOGY LICENSING, L.P.

---

[11] The American Express business unit involved in this joint venture later became known as First Data Corporation.

50