ROBERT T. HASLAM (CA Bar No. 71134)
robert.haslam@hellerehrman.com
ANDREW C. BYRNES (CA Bar No. 191516)
andrew.byrnes@hellerehrman.com
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA  94025
Telephone:   (650) 324-7000
Facsimile:   (650) 324-0638

MICHAEL K. PLIMACK (CA Bar No. 133869)
michael.plimack@hellerehrman.com
DALE A. RICE (CA Bar No. 146249)
dale.rice@hellerehrman.com
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104
Telephone:   (415) 772-6000
Facsimile:   (415) 772-6268

Attorneys for Plaintiff and Defendant
RONALD A. KATZ TECHNOLOGY LICENSING, L.P.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Katz Interactive Call Processing Patent Litigation, | Case No. 07-ML-01816-B-RGK (FFMx) |
| This document relates to: | **PLAINTIFF RONALD A. KATZ TECHNOLOGY LICENSING, L.P.'S OPPOSITION TO DEFENDANTS' COLLECTIVE MOTION FOR JUDGMENT OF PATENT INVALIDITY AS A MATTER OF LAW** |
| Ronald A. Katz Technology Licensing, L.P. v. Reliant Energy, Inc., CV 07-2096 RGK (FFMx) | |
| Ronald A. Katz Technology Licensing, L.P. v. TD Banknorth Inc., CV 07-2099 RGK (FFMx) | |
| Ronald A. Katz Technology Licensing, L.P. v. Ahold U.S.A., Inc., CV 07-2101 RGK (FFMx) | |
| Ronald A. Katz Technology Licensing, L.P. v. Time Warner Cable Inc., CV 07-2134 RGK (FFMx) | Date:<br>Time:          9:00 a.m.<br>Place:         Courtroom 850<br><br>The Honorable R. Gary Klausner |
| Ronald A. Katz Technology Licensing, L.P. v. American Int'l Group Inc., CV 07-2192 RGK (FFMx) | |
| CVS Corporation v. Ronald A. Katz Technology Licensing, L.P., CV 07-3002 RGK (FFMx) | |

Heller
Ehrman LLP

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................... 1

II. LEGAL STANDARDS...................................................................... 1

   A.  Standard for § 102(a) Anticipation. ....................................... 1

   B.  Standard for § 103 Obviousness. .......................................... 2

   C.  "Added Burden" For Prior Art Considered By The PTO. .................. 3

III. DEFENDANTS HAVE NOT SHOWN THAT THE CLAIMS
    AT ISSUE ARE INVALID AS A MATTER OF LAW.............................. 3

   A.  Claim 13 of the '065 Patent Is Valid. .................................... 3

   B.  Claim 7 of the '223 Patent Is Valid. ...................................... 8

   C.  Claim 86 of the '360 Patent Is Valid. .................................... 12

   D.  Claim 106 of the '360 Patent Is Valid. ................................... 13

   E.  Claim 2 of the '415 Patent Is Valid. ...................................... 17

   F.  Claim 19 of the '551 Patent Is Valid. .................................... 19

   G.  Claim 72 of the '703 Patent Is Valid. .................................... 21

   H.  Claim 116 of the '707 Patent Is Valid. ................................... 24

   I.  Claim 201 of the '707 Patent is Valid. ................................... 29

   J.  Claim 67 of the '762 Patent Is Valid. .................................... 31

IV. SUBSTANTIAL OBJECTIVE INDICIA OF NON-
    OBVIOUSNESS PRECLUDES SUMMARY JUDGMENT...................... 33

   A.  Long-Felt Need. ........................................................... 34

   B.  Commercial Acquiescence. ................................................ 34

V.  CONCLUSION ............................................................................ 35

Heller
Ehrman LLP

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*B & H Mfg. Inc. v. Foster-Forbes Glass Co.*,
   26 U.S.P.Q.2d 1066 (N.D. Ind. 1993) ................................................. 34

*Continental Can Co. v. Monsanto Co.*,
   948 F.2d 1264 (Fed. Cir. 1991) ......................................................... 34

*Eibel Process Co. v. Minnesota & Ontario Paper Co.*,
   261 U.S. 45 (1923)............................................................................ 34

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
   149 F.3d 1309 (Fed. Cir. 1998) ........................................................... 1

*Finisar Corp. v. The DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) ........................................................... 2

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply*,
   45 F.3d 1550 (Fed. Cir. 1995) ......................................................... 1, 2

*Graham v. John Deere, Co.*,
   383 U.S. 1 (1966)............................................................................. 34

*In re Donaldson Co.*,
   16 F.3d 1189 (Fed. Cir. 1994) ............................................................. 5

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ........................................................... 2

*KSR Int'l Co. v. Teleflex, Inc.*,
   127 S. Ct. 1727 (2007)........................................................... 2, 33, 34

*Nike Inc. v. Wolverine World Wide, Inc.*,
   43 F.3d 644 (Fed. Cir. 1994) ............................................................... 1

*OmegaFlex, Inc. v. Parker-Hannifin Corp.*,
   No. 2007-1044, 2007 WL 1733228 (Fed. Cir. June 18, 2007) ............ 2

*Ortho-McNeil Pharm. v. Mylan Labs., Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008) ..................................................... 2, 33

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007) ........................................................... 2

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008) ........................................................... 3

*Ronald A. Katz Licensing, L.P. v. AT&T*,
   63 F. Supp. 2d 583 (E.D. Pa. 1999)............................................. passim

Heller
Ehrman LLP

KATZ'S OPPOSITION TO COLLECTIVE MOTION FOR JUDGMENT     CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR PATENT INVALIDITY AS A MATTER OF LAW

*Ryko Mfg. Co. v. Nu-Star, Inc.*,
   18 U.S.P.Q.2d 1047 (D. Minn. 1990),
   *aff'd*, 950 F.2d 714 (Fed. Cir. 1991) .................................................................. 33

*Safety Car Heating & Lighting Co. v. General Elec. Co.*,
   155 F.2d 937 (2d Cir. 1946) ............................................................................. 34

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
   927 F.2d 1565 (Fed. Cir. 1991) .......................................................................... 1

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) ........................................................................ 34

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) .......................................................................... 1

*Verizon Cal., Inc. v. Ronald A. Katz Tech. Licensing, LLP*,
   326 F. Supp. 2d 1060 (C.D. Cal. 2003) ........................................................ 5, 6

**STATUTES**

35 U.S.C. § 102(a) ............................................................................................. 1

35 U.S.C. § 103(a) ............................................................................................. 2

35 U.S.C. § 112 ......................................................................................... passim

Heller
Ehrman LLP

KATZ'S OPPOSITION TO COLLECTIVE MOTION FOR JUDGMENT     CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR PATENT INVALIDITY AS A MATTER OF LAW

# I.    INTRODUCTION

Even after narrowing their motion to the ten claims they believe present their strongest case, defendants fail to justify summary judgment for even a single claim. Defendants face the heavy burden of establishing uncontroverted facts showing that each challenged claim is invalid by "clear and convincing evidence." *See, e.g., U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997).  Far from meeting that burden, defendants offer the Court vigorously contested and non-obvious combinations of elements of unrelated prior art references.  In many cases, the prior art references whose elements defendants seek to combine expressly teach away from each other, and, even if the teachings were combined, they would fail to teach all of the elements of the challenged claims.  Moreover, the PTO chose to allow many of these ten claims over the very same references upon which defendants rely, making defendants' burden in challenging these claims even more difficult.  Finally, in making their arguments, defendants gloss over the substantial objective indicia of non-obviousness, which alone provide sufficient reason to deny summary judgment.

# II.    LEGAL STANDARDS

Summary judgment is granted "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994).  All facts and inferences are construed in the light most favorable to the non-movant. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed. Cir. 1998).  A patent's presumption of validity can be overcome only through clear and convincing evidence, *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997).

## A.    Standard for § 102(a) Anticipation.

A patent is anticipated under 35 U.S.C. § 102(a) only if "all of the elements and limitations of the claim are found within a single prior art reference." *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir. 1991). Anticipation is a question of fact. *Glaverbel Societe Anonyme v. Northlake Mktg. &*

Heller
Ehrman LLP

1

*Supply*, 45 F.3d 1550, 1554 (Fed. Cir. 1995).  "[D]isclosure of each element is not quite enough—this court has long held that '[a]nticipation requires the presence in a single prior art disclosure of all elements of a claimed invention *arranged as in the claim*.'"  *Finisar Corp. v. The DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008)(emphasis added).

### B.    Standard for § 103 Obviousness.

A patent is obvious under § 103 only if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a).  This test includes several fact-based inquiries:  (a) the scope and content of the prior art; (b) the differences between the prior art and the claims; (c) the level of ordinary skill in the art at the time of the invention and (d) secondary considerations or objective indicia of nonobviousness.  *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1729-30 (2007).

The *KSR* Court confirmed that "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the art."  *Id.* at 1741-42; *see also Ortho-McNeil Pharm. v. Mylan Labs., Inc.,* 520 F.3d 1358, 1364 (Fed. Cir. 2008).  While the "teaching-motivation-suggestion" test ("TSM test") must not be applied too rigidly, it is still "important to identify a reason that would have prompted a person of ordinary legal skill in the art to combine the elements as the new invention does."  *KSR*, 127 S. Ct. at 1742.  The existence of a "reason" to combine the disparate pieces of prior art is "a pure question of fact."  *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); *see PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).  Thus, an expert declaration explaining why the prior art would not have led to the claimed invention will defeat summary judgment.  *Cf. OmegaFlex, Inc. v. Parker-Hannifin Corp.*, No. 2007-1044, 2007 WL 1733228, *3 (Fed. Cir. June 18, 2007) (denying summary judgment on obviousness due to competing expert testimony).

Heller
Ehrman LLP

2

## C.    "Added Burden" For Prior Art Considered By The PTO.

Where the Patent and Trademark Office ("PTO") considered the same prior art during prosecution, the validity challenger faces an "added burden" of showing "that the PTO was wrong in its decision to grant the patent." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (citation omitted).

## III.    DEFENDANTS HAVE NOT SHOWN THAT THE CLAIMS AT ISSUE ARE INVALID AS A MATTER OF LAW.

### A.    Claim 13 of the '065 Patent Is Valid.

Claim 13 of the '065 patent describes a system that receives from the telephone network DNIS signals identifying the called number and uses them to pick a format for the call.  The claim recites that callers are prompted to enter a customer number using their touch-tone phones, and if the system transfers them to an operator for assistance, the system displays that number to the operator, who can enter data into the system.

Defendants rely primarily on Lotito, alone and in combination with elements of Moosemiller, to argue 065:13 is invalid.  As explained below, a person of ordinary skill in the art ("POSITA")[1] had no motivation to modify the Lotito system – a single-user voice mail system implemented on a PBX – in order to create a call center system like that described by 065:13.  Moreover, neither Lotito nor Lotito with Moosemiller teaches or suggests the fundamental concepts recited in 065:13.  Indeed, the PTO found in the '065 prosecution that Moosemiller would *not* be combined with interactive "operator terminal" limitations such as in 065:13.  *See* Declaration of Chris Martiniak ("Martiniak Decl."), Ex. 4 at 2.

#### 1.    It would not have been obvious to modify Lotito in light of Moosemiller in the way required by Claim 065:13.

A POSITA would not have modified – or even considered – Lotito to create a

---

[1] For these patents, a POSITA would be a person with a "bachelor's degree in a field related to computer telephony . . . or . . . at least seven years experience in the computer telephony field."  *See* Brody Dec. ¶ 5 (incorporating 4/29/08 Brody Decl. at ¶¶ 7-8).

Heller
Ehrman LLP

3

system with the features required by 065:13.  Declaration of Dr. Arthur Brody in Support of Plaintiff Ronald A. Katz Technology Licensing, L.P.'s Opposition to Defendants' Collective Motion for Judgment of Patent Invalidity As A Matter of Law ("Brody Decl."), ¶ 14.  Lotito and Moosemiller are so dissimilar that a POSITA would not have been motivated to combine their elements.  *Id.*, ¶¶ 15-18.

Lotito describes a voice mail system operated on a company's own telephone system, such as a PBX system.  Customers of the company that owns this system, and other third parties, can call and leaves messages in voice mailboxes for employees, such as sales personnel.  An employee of the company can call and, after entering identification allowing her access to the system as an account owner, retrieve messages and perform other functions such as changing greetings.  Lotito uses DID (direct inward dial) to route callers to voice mailboxes.  Moosemiller, on the other hand, describes a system that made use of DNIS signals and was, according to defendants' expert, "useful for a service bureau."[2]

A POSITA would understand that the DNIS service described in Moosemiller is different from the DID lines described in Lotito.  DID signals show the dialed extension number and are provided by the Local Exchange Carrier (LEC) switch connected to the customer premise system, while the DNIS signals of Moosemiller are determined by a long distance carrier, typically in connection with 800 numbers, and then delivered through the LEC switch and shows the 800 number called.  A POSITA would not be motivated to modify a Lotito system with the Moosemiller DNIS service because it would cost more to do so, would require local calls that currently are delivered with DID to be routed through a long distance carrier for DNIS treatment, and would provide no corresponding benefit.  Indeed, the fact that both systems delivered dialed digits would be reason not to combine the teachings of these references, since Lotito already had a system for receiving all the dialed digit

---

[2] Nicholes ¶ 56.  A service bureau is a company providing call center services to a number of companies.  Brody Decl., ¶ 17.

Heller
Ehrman LLP

1  information it needed.

2      Moreover, Moosemiller says nothing about using its system to provide voice

3  mail. *Id.*, ¶ 17.  Defendants argue that both systems mention sales order entry, but

4  Lotito merely notes that operators on secretarial lines can take phone orders

5  manually, while Moosemiller states that its system *could* be used for automated order

6  entry (with no explanation of how it would do so).  *Id.*

    **2.**    **Lotito and Moosemiller Do Not Teach or Suggest 065:13[b].**

8  | **065:13[b]** | means for receiving called terminal digital data (DNIS) signals . . . to identify the select operating format from a plurality of distinct operating formats; |
9  | --- | --- |

10      The "means for receiving" element of 065:13 is subject to § 112, ¶ 6.  *See*

11  *Verizon Cal., Inc. v. Ronald A. Katz Tech. Licensing, LLP*, 326 F. Supp. 2d 1060,

12  1100 (C.D. Cal. 2003); Defendants' Opening Brief re Motion For Summary

13  Judgment Under Section 112 (Doc. No. 1867-2) at 31-32.  Defendants cannot make a

14  prima facie case that prior art invalidates this claim element without a means-plus-

15  function analysis that identifies the claimed function performed by the means,

16  identifies the structure in the patent that performs that function, and demonstrates that

17  the prior art references teach or make obvious using the same or an equivalent

18  structure that performs the function ("§ 112, ¶ 6 analysis").  *In re Donaldson Co.*, 16

19  F.3d 1189, 1193 (Fed. Cir. 1994).  Because defendants have not even attempted this

20  analysis for "means for receiving," they have not shown that Lotito and Moosemiller

21  disclose this claim, and summary judgment is not proper.  *Id.*; Brody Decl., ¶ 19.

22      Lotito does not teach using DNIS to select an operating format from multiple

23  formats as required by 065:13[b].  Brody Decl., ¶¶ 20-32.  The text of Lotito relied

24  on by defendants says that DID lines route calls to a voice message basket (*i.e.,* the

25  location where Lotito stored voice mail messages).  *Id.*, ¶¶ 21-26.  But the DID

26  signals described in Lotito are different from DNIS signals described in, for example,

27  Moosemiller.  Brody Decl. ¶ 18.

28      In any event, the defendants have not established that Lotito teaches that either

Heller
Ehrman LLP

5

1  DID or DNIS can be used to select an interactive format.  Moreover, this Court has

2  construed "format" to mean a "call processing flow . . . that sets forth the content and

3  sequence of steps to gather information from and convey information to callers

4  through pre-recorded prompts and messages."  Brody Decl., ¶ 27.  MDL Claim

5  Construction, at 16.  Lotito's use of DID to route calls to a message basket is not

6  selecting a format, because the Lotito message basket is not a "call processing flow,"

7  and any selection of one is irrelevant to 065:13[b].  *Id.*, ¶¶ 27-28.

8      Further, Lotito not only fails to disclose providing interactive formats, it

9  actually teaches *away* from using them when it specifically states that no prompts are

10  provided for callers leaving voicemail messages.  *Id.*  Defendants have not identified

11  formats in Lotito, much less shown how or why DNIS could be used to select from

12  multiple formats.

13      Though Moosemiller mentions using DNIS, a POSITA would not have been

14  motivated to modify Lotito in light of Moosemiller.  *Id.*, ¶¶ 29-30; *supra*, III.A.1.

15  Moreover, defendants do not explain why a POSITA would modify Lotito to use

16  DNIS instead of or with DID, or, even if one did, how the hypothetical system would

17  then use DNIS and/or DID to select among a plurality of *formats*.  Brody Decl., ¶¶

18  31-32.

19      **3.    Lotito and Moosemiller and Extended TeleMessaging Do Not
        Teach or Suggest 065:13[e].**

20

21  | 065:13[e] | processing means . . . for receiving customer number data entered by a caller and for storing the customer number data in a memory and based on a condition coupling an incoming call to the operator terminal, the processing means visually displaying the customer number data . . . |
22

23      **a.    Defendants do not perform the required means-plus-
             function analysis for "processing means."**

24

25  The "processing means" of 065:13 requires a § 112, ¶ 6 analysis.  *See Verizon*

26  *Cal., Inc. v. Ronald A. Katz Tech. Licensing, LLP*, 326 F. Supp. 2d 1060, 1104 (C.D.

27  Cal. 2003); Defendants' Opening Brief re Motion For Summary Judgment Under

28  Section 112 (Doc. No. 1867-2) at 33-34.  Because defendants do not perform this

Heller
Ehrman LLP

6

analysis, summary judgment is not proper.  Brody Decl., ¶ 34.

**b.      Lotito and Moosemiller do not teach or suggest "receiving customer number data entered by a caller."**

'065:13[e] requires that the system receive "customer number data entered by a caller."  This Court has construed "customer number data" to mean a number that a vendor or merchant uses to identify *a* "*customer.*"  Brody Decl*., ¶* 36.  Accordingly, 065:13[e] requires that the system receive a number identifying a customer of the merchant or vendor on whose behalf the 065:13 system is being operated.  *Id.* Regardless of whoever might manufacture the Lotito system, therefore, the "customer number data" must be that of customers of the company using the system in operation.  *Id.*

Lotito fails to teach or suggest a system that receives any customer number. *See generally* Brody Decl., ¶¶ 35-36.  The only callers who enter identification numbers in Lotito are the *employees* of the company on whose behalf the Lotito voice mail system is being operated, but the employees are not the company's *customers*.  If *customers* of the company call the Lotito system, they can leave a message without entering any identification data.  Nor would it be obvious to require that the customers enter identification data, because a company wants to make it as easy as possible for their customers to leave messages.  *Id.*  Accordingly, Lotito fails to teach or render obvious a system that receives "*customer* number data entered by a caller" ('065:13[e], emphasis added), and defendants do not rely on any other references as teaching this requirement.

**c.      Lotito and Moosemiller do not teach or suggest "storing the customer number data in a central memory."**

Defendants claim Lotito teaches "storing" the customer number data because of: (1) employee entry of his personal ID code to access the system; (2) the system's collection of usage data; and (3) an audit trail the system maintains of command entered by callers.  *See* Brody Decl. ¶ 37.  But the first addresses employee data, not "customer" number data, and the second and third address storage of *usage* data and

caller-entered *commands*, respectively – not customer number data.  Brody Decl., ¶¶ 37-38.  Indeed, usage data is just statistics about the system's operations, and the audit trail stored only commands callers entered to navigate the Lotito voice mail system.  Neither is remotely related to a number used by a merchant or vendor to identify a *customer*.  *Id.*

**d.**     **Lotito and Moosemiller do not teach or suggest "visually displaying the customer number data."**

The passage relied upon by the defendants for this requirement refers to a call by a third party to a "secretary line."  Such a caller does not enter any identification number to reach this line and therefore there is no caller-entered customer number data to be displayed, as required by this claim.  Brody Decl., ¶¶ 40-41.  Instead, what appears on the screen are call-handling instructions the owner of the line (the secretary's boss) can provide.  *Id.*  The screen shot in Extended TeleMessaging relied on by defendants as showing what was depicted on the operator screens shows that what is displayed is a *sales manager's name and phone number*, not caller-entered customer number data.  Brody Decl., ¶ 44.  *Id.*

**e.**     **Lotito does not teach or suggest the operator "updat[ing] data relating to the caller."**

The passage cited by the defendants shows that an operator can enter *commands* on behalf of a caller who has accessed the system with a rotary telephone.  This does not teach the operator "updat[ing] data relating to the caller."  Brody Decl., ¶¶ 41-43.  Further, "the" caller in this claim limitation refers to the caller who has entered "customer number data."  But the caller in the cited portion of Lotito has not entered any such data.  *Supra*, III.A.3.b.  Further, there is no suggestion that there is pre-existing "data related to the caller" to be updated and, since the caller has not entered her own identification information, the system could not access her data, if any existed, for updating.  Brody Decl., ¶ 43.

**B.**     **Claim 7 of the '223 Patent Is Valid.**

Claim 7 of the '223 patent describes a method that generally involves receiving

Heller Ehrman LLP

calls in both "toll-free" and "area code" modes, qualifying callers at least from the
toll-free mode, giving callers in the two modes different preliminary greetings, and
concurrently processing verified calls from the two modes together.  Defendants rely
on Cotter[3] and Riskin,[4] ignoring that the PTO considered both of those references
during the '223 prosecution.  Martiniak Decl., Ex. 5.

### 1.   It Would Not Have Been Obvious To Combine Elements of Cotter And Riskin To Form A System Covered By Claim 223:7.

A POSITA would not have combined the elements of the systems in Cotter
and Riskin because of their fundamentally inconsistent objectives.  Brody Decl., ¶¶
61-68.  While Riskin is designed to locate and connect the caller to the nearest of
thousands of different retailers, Cotter's objective is to *prevent* the caller from
connecting to the closest retailer and instead have him place his order with a central
system.  *Id.*  A POSITA would not be motivated to modify Riskin to allow callers to
place orders because it would be expensive, and would require the system to maintain
inventory and price records on countless different items, process payments and
interact with retailers for shipping and service – all significant hurdles in Riskin's
1989 time frame.  *Id.*, ¶ 66.

Defendants suggest that a hypothetical system implementing both toll-free and
local access call modes (as required by 223:7) would "simplify the customer
experience," but a POSITA would understand precisely the opposite.  Brody Decl., ¶
69-78.  Even defendants admit that both systems aim to use a *single* telephone
number, thereby teaching away from using different called numbers, not to mention
different formats as required by this claim.  *Id.*, ¶ 76.

---

[3] Cotter describes a single centralized telephone service that handles food orders for
affiliated pizza parlors.  Brody Decl. ¶¶ 57-60.

[4] Riskin describes a dealer locator service that accepts calls from any nationwide
location and routes the call to the nearest dealer. Brody Decl., ¶¶ 53-56.

Heller
Ehrman LLP

9

### 2. Riskin and Cotter Do Not Teach or Render Obvious 223:7[b], [e].

| | |
|---|---|
| **223:7[b]** | receiving calls in the toll free call mode and providing an interface format associated with the toll free call mode; |
| **223:7[e]** | receiving calls in the area code mode and providing another interface format associated with the area code mode; |

Limitations 223:7 [b] and [e] together require that calls are received in both the toll-free and area-code modes, and that a different format is provided via each mode of access. Brody Decl., ¶ 79. However, while Riskin uses the toll-free mode, Cotter does not disclose or suggest either call mode, so a combination would not necessarily use both modes of access. *Id.*, ¶ 70-72.

Further, defendants fail to demonstrate that there are interactive "formats" in Riskin and Cotter, much less different formats provided via different call modes. Brody Decl., ¶¶ 84-89. The Cotter text defendants cite does not disclose the type of interactive format the Court has defined the claim term "format" to require; instead, orders are placed with live operators. *Id.*, ¶ 85-86; *see supra*, III.A.2. Neither do defendants explain why Cotter and Riskin would implement *different* formats for callers accessing the system via two different call modes. Brody Decl., ¶ 87. Regarding a different claim, defendants suggested the opposite. *Id.*, ¶ 88.

### 3. Riskin And Cotter Do Not Teach or Render Obvious 223:7[c]-[d].

| | |
|---|---|
| **223:7[c]** | providing an identification number to facilitate participation via the toll free call mode; |
| **223:7[d]** | verifying the participation number for approval[;] |

Riskin and Cotter do not disclose "providing an identification number to facilitate participation" or "verifying the participation number for approval," as required by 223:7[c]-[d]. Brody Decl., ¶¶ 90-97. The "participation number" recited in 223:7[c]-[d] is a number that *qualifies* the caller for participation. *Id.*, ¶¶ 91-94. By contrast, the Riskin "extension number" defendants rely on serves the entirely different purpose of *routing* the call to a particular service or dealer. Because the

Riskin "extension numbers" serve a completely different function than required by 223:7[c] and [d]'s participation number, they cannot teach or render obvious these claim elements. *Id.*, ¶ 95. Further, a POSITA would not be motivated to add the use of a true "participation number" to Riskin because limiting use of the system in this way is contrary to Riskin's objective of connecting any caller nationwide with the appropriate local dealer. *Id.*, ¶ 96-97.

### 4. Riskin And Cotter Do Not Teach or Render Obvious 223:7[f]-[g].

| 223:7[f] | providing preliminary automated greetings specific to respective interface formats associated with the toll free call mode and the area code mode . . . ; |
|----------|--------------------------------------------------------------------------------------------------------------------------------------------------------|
| 223:7[g] | and concurrently processing the verified calls received in the toll free call mode and the calls received in the area code mode in accordance with at least certain common operations of the interface formats . . . . |

#### a. Riskin and Cotter do not suggest "specific preliminary greetings" for two call modes.

Riskin and Cotter do not disclose different "specific preliminary greetings" for two call modes, and such greetings would not make sense for the systems. Brody Decl., ¶¶ 98-103. Cotter centralizes order placement for multiple franchises of the same company or provider and therefore a POSITA would have no reason to implement *different* "preliminary greetings" in this context. *Id.*, ¶ 102. The hypothetical combination also would have made no sense to a POSITA, because in order to meet this claim's requirements it would have to provide one greeting in the area-code mode, *e.g.*, for a local pizza parlor and another greeting in the toll-free mode for some random other retailer. *Id.*, ¶ 103.

#### b. Riskin and Cotter do not suggest common operations of the different formats in two call modes.

Defendants do not explain how the combined Riskin-Cotter system would include "common operations . . . of the formats" as recited in 223:7[f]-[g], which a POSITA would understand to mean, for two formats, operations where the content and/or sequence of steps to gather/convey information from/to callers is the same or

Heller
Ehrman LLP

11

1  shared.  Brody Decl., ¶ 104-106.  The Riskin "call record journal" that defendants

2  cite is created *after* the call, so it could not be a common operation of *formats*.  *Id.*

3  **C.   Claim 86 of the '360 Patent Is Valid.**

4  Claim 86 of the '360 patent describes a method where callers enter a customer

5  number and at least one other form of identification using touch-tone telephones, and

6  transfer to an operator with the system displaying least part of the customer number

7  to the operator.  The operator is able to update data in a memory by entering data

8  using his operator terminal.  Defendants rely on Lotito, which, as noted above, is a

9  voice mail system fundamentally unlike these claims.  Moreover, the PTO considered

10  Lotito during the '360 prosecution.  Martiniak Decl. Ex. 6 at 4.  Defendants fail to

11  meet their very heavy burden.

12  **1.   Lotito Does Not Teach or Render Obvious  360:86[d].**

13  | **360:86[d]** | receiving customer number data entered by a caller in addition to one other form of identification for the caller and storing at least the customer number data in a memory . . . ; |
14  | --- | --- |

15  The Lotito passage relied on by defendants does not teach "receiving customer

16  number data entered by a caller" because only employees (not customers) enter

17  identification codes.  An employee PIN is not "*customer* number data" because it

18  identifies an *employee* of the merchant or vendor, not one of their *customers.  Supra*,

19  III.A.3.b; Brody Decl., ¶ 114.  If a *customer* calls the Lotito system, she does not

20  enter a code to leave a message.  A POSITA would have no reason to modify the

21  system to require *customers* leaving messages to enter any sort of code, much less

22  two forms of identification.  Brody Decl., ¶ 114.

23  **2.   Lotito Does Not Teach or Render Obvious 360:86[f].**

24  | **360:86[f]** | updating data relating to the caller in the memory by incorporating other data entries provided at the operator terminal. |
25  | --- | --- |

26  Lotito does not teach "updating data relating to the caller" with "data entries

27  provided at the operator terminal," as required by 360:86[f].  Instead it teaches an

28  operator entering commands *for* a caller to help the user "control the system."  Brody

Heller
Ehrman LLP

12

1   Decl., ¶ 120-124.  These commands are not "data," much less "data relating to the

2   caller."  *Id.*  Further, there is no suggestion that the Lotito system stores these

3   operator inputs in the "audit trail" that defendants cite.  *Id.*

4         The unnamed prior art discussed in Lotito, in which a caller could give the

5   operator a message to type in for the user's later retrieval, also does not render

6   obvious 360:86[f] because *it is not part of the Lotito system*.  Brody Decl., ¶ 123.

7   Defendants do not show that this unnamed system performs any other step of 360:86,

8   nor can they claim that the Lotito system performs this step.  *Id.*  The Lotito system,

9   designed to take voicemail messages, specifically teaches an improvement on such

10  operator-assisted manual message entry and would not motivate a POSITA to

11  perform this step.  *Id.*  Even if it did, it would still fail to teach "updating data relating

12  to the caller."  *Id.*  Entering a new message from a caller is not "updating data" –

13  Lotito does not suggest that a file is kept for callers seeking to leave messages, let

14  alone that such files are updated.  *Id.*  Further, the caller would not have keyed in two

15  forms of identification, as required by 360:86[d].  *Id.*

16        **D.    Claim 106 of the '360 Patent Is Valid.**

17        Claim 360:106 depends on Claim 360:86 and 360:98.  It adds the steps of: (a)

18  testing the customer number against a file of negative file data (360:98); and (b)

19  selectively providing callers with different cues (in accordance with the format)

20  based on their customer identification.  (360:106.)

21        Defendants incorrectly assert that Daudelin 910 teaches claim 106.  Daudelin

22  910 describes standard operator services provided by a telephone company such as

23  person-to-person calls, calling card calls, and third party billing calls.  Brody Decl., ¶

24  132.  These basic telephony services are fundamentally unlike this claim, which is

25  directed to customers calling a *call center*.  *Id.*  Katz highlighted Daudelin '910 to the

26  PTO during the '360 prosecution, and the PTO duly considered the reference.

27  Martiniak Decl. Ex. 6 at 1-3.

28

Heller
Ehrman LLP

13

### 1. Daudelin 910 Does Not Teach or Render Obvious 360:86[d] and 360:86[e].

| | |
|---|---|
| **360:86[d]** | receiving customer number data entered by a caller in addition to one other form of identification for the caller and storing at least the customer number data in a memory . . .; |
| **360:86[e]** | visually displaying at least a portion of the customer number data at the operator terminal; and |

Daudelin 910 does not teach or render obvious "receiving customer data entered by a caller in addition to one other form of identification for the caller" and visually displaying that data at the operator terminal, as required by claims 360:86[d] and 360:86[e]. Brody Decl., ¶¶ 136-137. Katz presented this same key distinction to the PTO during the '360 prosecution: Daudelin does not teach "displaying data entered by a caller at the operator terminal." Martiniak Decl. Ex. 6 at 1-2.

Defendants rely on a procedure describing a caller who wishes to bill a third party for a call, and claim that the caller's entry of the *third party's* telephone number is entry of the required customer number. *Id.* The third party's number plainly is not a customer number for the caller, because it *does not identify the caller*, and entry of such does not teach or render obvious entry or display of a *customer number* as required by '360:86[d] and [e]. *Id.*, ¶ 136-138.

### 2. Daudelin 910 Does Not Teach or Render Obvious 360:86[f].

| | |
|---|---|
| **360:86[f]** | updating data relating to the caller in the memory by incorporating other data entries provided at the operator terminal. |

The Daudelin 910 passage relied on by defendants involves a procedure where a caller wishes to bill a call to a third party but fails to enter a valid billing number. In that situation the caller can be transferred to an operator who will then enter the billing number. Brody Decl., ¶¶ 139-143. This does not teach operator entries "updating data relating to the caller," as required by 360:86[f] because the operator's entry of the third party's billing number does not update "data relating to the caller" – the charge for the call will go on the third party's bill, not the caller's. *Id.* Further, limitation 360:86[f]'s step of "updating data relating to the caller" is only met if such

KATZ'S OPPOSITION TO COLLECTIVE MOTION FOR JUDGMENT    CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR PATENT INVALIDITY AS A MATTER OF LAW

1  updating occurs after the caller has entered a customer identification number.

2  360:86[d].  *Id.*  A third party billing number is not a customer number, and even if it

3  were a caller only reaches the operator on this branch of Daudelin's procedure by

4  *failing* to enter a valid number.  *Id.*  Entering an invalid number cannot meet the

5  requirement of "receiving customer number data entered by a caller."  *Id.*, ¶ 143.

### 3.   Daudelin 910 Does Not Teach or Render Obvious  360:98[a].

| | |
|---|---|
| **360:98[a]** | A method according to claim 86, further comprising the step of: testing said customer number data against a file including a file of negative file data. |

Neither Daudelin 910's "person-to-person call handling procedure" nor its third party billing procedure teaches or suggests "[a] method according to claim 86, further comprising the step of: testing said customer data against a file including a file of negative file data" as disclosed by 360:98[a].  Brody Decl., ¶¶ 144-149.

Defendants' argument regarding the elements of claim 86 relied on Daudelin's third-party billing procedure.  Brody Decl. ¶ 146.  In addressing 360:98, however, defendants abruptly change course and rely on Daudelin's person-to-person call handling procedure, which determines whether there are restrictions on the called or calling parties (for example, prison telephones may be restricted from person-to-person calls).  Defendants' argument fails because defendants do not, and cannot, show that the person-to-person call procedure satisfies the requirements of 360:86[a]-[f] from which claim 98 depends.  Brody Decl., ¶¶ 145-147.

Even if it did meet the requirements of the base claim, Daudelin's person-to-person call procedure does not "test[] said customer data against a file including a file of negative file data" as required by 360:98[a].  Brody Decl., ¶ 147.  The "customer data" tested in claim 360:98[a] is the same "customer data" entered by the caller in 360:86[d].  *Id.*  The Daudelin 910 person to person call procedure *does not test that data*; to the contrary, it tests signals indicating the calling party's telephone number (automatically provided by the telephone network) to see whether restrictions apply.  That signal is not a customer number *entered* by the caller as required.  *Id.*

Heller
Ehrman LLP

15

1    Defendants also rely on the third party billing procedure's test against billing

2  coin stations to teach this claim limitation.  This procedure also is not "a method

3  according to claim 86."  *Supra*, III.D.1-2.; Brody Decl., ¶ 149.  Additionally, the

4  procedure does not "test[] said [caller] customer number data against . . . a file of

5  negative file data" because here the caller enters the number *of the party to be billed*

6  – this is not calling customer number data as required by 360:98.  Moreover, the

7  database described in Daudelin 910 is not a negative file under the Court's

8  construction (a file containing a list of invalid numbers).  Brody Decl., ¶ 150.  Rather,

9  Daudelin 910 screens out coin stations by testing the entered number against a

10  database of *valid* numbers that also contains associated data for the valid numbers

11  (such as that they are coin stations).  *Id.*  A POSITA would not modify this procedure

12  to meet 360:98[a] because it would not make sense to test for both valid and invalid

13  numbers, and testing against valid numbers is preferable because the system utilizes

14  data associated with the valid numbers.  *Id.*

15    **4.    Daudelin 910 Does Teach or Render Obvious  360:106[a].**

16  | **360:106[a]** | A method according to claim 98, further comprising the step of: selectively providing different cues in accordance with said select operating format to customers based on customer identification data. |
17

18    Neither Daudelin 910's third party billing procedure, nor its person-to-person

19  call handling procedure, is a "method according to claim 98," because they do not

20  satisfy the requirements of claim 86.  *Supra*, II.D.1-3.  Even if they did, neither

21  procedure teaches "selectively providing different cues" as required by 360:106[a].

22  Defendants argue that the third party billing procedure meets this limitation by

23  reading back valid billing numbers to callers; but "reading back" a number is not *cue*.

24  Brody Decl., ¶ 155-157.  (*Cue* is construed to mean "questions or prompts which are

25  given to a caller" *Id.*)  The cues of 360:106[a] thus require playing questions or

26  prompts programmed into the system, not just playing caller comments back to them.

27  *Id.*  While the Daudelin '910 read-back is *followed* by a cue (which asks the caller for

28  verification that the number read was correct), *that* cue is the same for every caller.

Heller
Ehrman LLP

16

1   *Id.*  The person-to-person call handling procedure also does not meet this limitation

2   because, after determining whether restrictions apply, the system does not provide

3   any cues – much less "selectively provide different cues" – only announcements are

4   made.  Brody Decl., ¶¶ 161-163.

5        **E.**    **Claim 2 of the '415 Patent Is Valid.**

6        Claim 415:2 depends on claim 415:1.  It describes a method in which calls are

7   received with calling number signals provided automatically by the telephone

8   network, which signals the system tests against negative data to determine the

9   acceptability of the call.  Once a call is accepted, the system provides a select format

10  that cues the caller and receives touch-tone signals in response.  Some of those touch-

11  tone signals are tested against stored positive data to determine whether to provide

12  the caller with further cues.  Defendants incorrectly argue that this method is taught

13  by the Billinger patent, which Katz specifically presented to the PTO for

14  consideration during the '415 prosecution.  Martiniak Decl. Ex. 7 at 2-3.

15       **1.**    **Billinger Does Not Teach or Render Obvious 1[a], [e].**

| **415:1[a]** | A process for determining the acceptability of calls and <u>executing formats</u> in association with a communication facility . . . : |
| --- | --- |
| **415:1[e]** | interfacing via said communication facility to accepted calls to provide voice signals for cueing callers and receiving responsive digital data <u>in accordance with a select format</u>; and |

19

20       The Billinger patent describes a system and method to control long distance

21  calling based on the calling number provided through Automatic Number

22  Identification ("ANI").  Based on ANI signals, each call is either (1) allowed to be

23  connected to a called party through the long distance network, (2) connected to the

24  called party only if a valid authorization code is entered, or (3) denied access to the

25  network.  Brody Decl., ¶ 168.  Billinger does not involve executing multiple formats

26  or a "select" format on the basis of DNIS, as required by 415:1[a] 415:1[e].  Brody

27  Decl., ¶¶ 170-171; *supra*, III.A.2.  There are no multiple, different interactive call

28  processing flows anywhere in Billinger, including in the control of long distance

Heller
Ehrman LLP

17

1  facilities defendants cite. *Id.*, ¶¶ 172-173. Nor is there a "select" format from among

2  the multiple "formats" contemplated by the claim. *Id.*, ¶¶ 174-179.

3  ## 2.  Billinger Does Not Teach or Render Obvious 415:1[f].

| 415:1[f] | testing at least certain of the responsive digital data against stored positive data to determine if further voice signals for cueing callers should be provided. |
|---|---|

6  Billinger does not disclose or suggest the testing of data obtained through the

7  select format used in 415:1[e] to determine if further cues should be provided, as

8  disclosed by 415:1[f]. Brody Decl., ¶¶ 180-195. Rather, Billinger contains only a

9  single authorization prompt: if the code is valid, the long-distance call proceeds, and

10  if not, the call is abandoned. *Id.*, ¶¶ 184-194.

11  Defendants argue that 415:1[f] is rendered obvious because the Billinger

12  system *could* have been modified so that the announcement played for calls

13  abandoned after an ANI test was also be played for calls abandoned because, after the

14  ANI test was passed, the entered authorization code was invalid. Brody Decl., ¶¶

15  187-194. Defendants offer no reason why a POSITA would want to modify the

16  system this way. *Id.*, ¶ 190. Billinger plays the announcement after the ANI test

17  because at that point the caller has not yet heard an audio prompt; by contrast, after a

18  failed attempt to enter an authorization code, the caller has already heard the prompt

19  to enter the code and understands the status of the call. *Id.*, ¶¶ 190-191.

20  Even if the system were so modified, defendants do not show that the code was

21  tested "to determine if further voice signals for cuing callers should be provided."

22  *Id.*, ¶ 192. In fact, Billinger describes just the *opposite* – if the caller's authorization

23  code tests successfully, then the automated interface is abandoned and the call

24  proceeds as a long distance call with no further "voice signals." *Id.* Finally, even if

25  Billinger could be interpreted as testing the code to determine if the announcement

26  should be played, a "goodbye" message is not the equivalent of *cues* prompting the

27  caller to provide additional information in an interactive call processing flow *Id.*, ¶

28  193. Thus, even if Billinger were modified as defendants hypothesize, it would not

Heller
Ehrman LLP

18

meet the claim requirements.  Brody Decl., ¶¶ 190-194.

### F.     Claim 19 of the '551 Patent Is Valid.

Claim 551:19 incorporates 551:18, and thereby 551:14.  These claims describe a system that receives ANI and DNIS signals from the telephone network, uses the DNIS signals to control the processing formats used, qualifies callers based on key numbers, tests those number for validity, stores and processes data relating to the callers, and provides to callers and stores computer-generated numbers.  Defendants incorrectly assert that the combination of elements of the McFiggins[5] and Kraus[6] patents renders claim 19 obvious.  Kraus was considered during the '551 prosecution. Martiniak Decl. Ex. 8.

#### 1.     A POSITA Would Not Have Been Motivated To Combine Elements of McFiggins And Kraus To Arrive At 551:19.

The McFiggins and Kraus systems are so dissimilar in their context, purpose and functionality that it would have been definitively non-obvious for a POSITA to combine their elements:  1) the McFiggins postage meter holder is well known to the vendor such that a credit checking system is unnecessary, 2) McFiggins has no use for DNIS, as the meter company's phone number is irrelevant to whether a caller's meter will be recharged, 3) use of ANI would add unnecessary complexity to McFiggins because the caller is already efficiently identified by an account number or meter number (whereas a company may call from any of many different phone lines), and because it would introduce into the fully automated system the use of operators on *every* call to verify data retrieved by ANI.  Brody Decl., ¶¶ 204-206, 213-214.

---

[5] The McFiggins patent describes a system for recharging postage meters using telephone calls.  Brody Decl., ¶ 202.

[6]   The Kraus patent describes a system for obtaining "credit intelligence" from a credit center during a telephone call, which the caller can use to determine whether to provide service on a credit basis.  *Id.*, at ¶ 203.

Heller
Ehrman LLP

### 2. Defendants Do Not Perform Required Means-Plus-Function Analyses for 551:14[e], [g], and 551:18[a].

| | |
|---|---|
| **551:14[e]** | qualification structure to access the record memory to test key number data provided by the individual callers to ensure that the key number data is valid; |
| **551:14[g]** | analysis structure connected to the record memory for processing at least certain of the data relating to certain individual callers subject to qualification by the qualification structure. |
| **551:18[a]** | A control system according to claim 14, further including means to control processing formats of the analysis structure in accordance with signals automatically provided by the communication facility indicative of one of a plurality of called numbers (DNIS). |

This court has stated that the "qualification structure" of 551:14[e] and the "analysis structure" of 551:14[g] should be construed as § 112, ¶ 6 limitations, requiring means-plus-function analyses.  MDL Claim Construction at 33-34.  While defendants identify the computer (20) in McFiggins as the "qualification structure," they do not identify which structure in McFiggins is the "analysis structure," and for neither do they undertake a § 112, ¶ 6 analysis.  *Id.*, ¶ 208-10.  Summary judgment is therefore not proper.  *Id.*, ¶¶ 207-210.  Further, having failed to undertake these analyses despite the legal presumption that the "means to control processing formats of analysis structure" element of 551:18[a] is controlled by § 112, ¶ 6, defendants have failed to make a prima facie case that McFiggins and Kraus meet this claim limitation.  Brody Decl., ¶ 215.

### 3. McFiggins and Kraus Do Teach or Render Obvious 551:18[a].

| | |
|---|---|
| **551:18[a]** | A control system according to claim 14, further including means to control processing formats of the analysis structure in accordance with signals automatically provided by the communication facility indicative of one of a plurality of called numbers (DNIS). |

Beyond the failure in analytical methodology for this element as noted above, the Defendants cannot show that the asserted combination teaches or renders obvious the elements of 551:18[a].  The combination is not a "control system according to claim 14," as required by 551:18[a].  *Supra*, III.F.2; Brody Decl., ¶ 211.  Even if it

Heller
Ehrman LLP

20

KATZ'S OPPOSITION TO COLLECTIVE MOTION FOR JUDGMENT     CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR PATENT INVALIDITY AS A MATTER OF LAW

1  were, it does not teach "means to control processing formats" in accordance with

2  DNIS, which is also required by 551:18[a].  Brody Decl, ¶¶ 212-214.  Furthermore,

3  Defendants overstate the teachings of Kraus when they argue that the postage

4  recharge system could determine whether callers could recharge a meter based on a

5  DNIS credit check.  *Id.*, ¶ 214.  Kraus does not use DNIS to verify credit (indeed,

6  how could the *called number* verify the *caller's* credit?), and Defendants do not

7  explain how DNIS could control whether the caller was entitled to recharge his

8  meter.  *Id.*, ¶¶ 213-214.  Further, defendants do not explain how DNIS could be used

9  to control formats in the hypothetical system.  *Id.*  Indeed, because Kraus has no

10  interactive formats and McFiggins has at most one, the combination could not teach

11  use of plural formats, much less use of DNIS to select one.  Brody Decl., ¶ 213.

### G.    Claim 72 of the '703 Patent Is Valid.

12

13          Claim 72 of the '703 patent describes a system that interfaces with callers

14  based on DNIS, uses calling number signals to control at least some operations, uses

15  a voice generator to ask callers for data and identification, processes the data callers

16  provide in response, selects at least one subset of callers, qualifies callers during at

17  least an interval of time based on comparing their identification data against stored

18  identification data, and stores data in association with stored identification data.

19  Defendants incorrectly argue that the Riskin patent invalidates 703:72, despite Riskin

20  having been considered during the '703 prosecution.  Martiniak Decl., Ex. 9.

21          **1.    Defendants Do Not Perform Required Means-Plus-Function Analyses.**

22

| | |
|---|---|
| **703:72[f]** | processing means for processing said data supplied by said individual callers, said processing means coupled to said interface means . . .; |
| **703:72[g]** | qualification means coupled to said interface means for limiting access during at least an interval of time to said processing means based upon comparing said identification data with previously stored identification data . . . ; and |
| **703:72[h]** | means for storing coupled to said interface means for storing said data in association with said previously stored identification data. |

28          The "processing means," "qualification means" and "means for storing"

21

Heller
Ehrman LLP

1  elements of this claim require a § 112, ¶ 6 means-plus-function analysis.  Brody

2  Decl., ¶ 227.  Because defendants do not perform these analyses, defendants have not

3  shown that Riskin discloses this claim and summary judgment is not proper.  *Id.*

### 2.   Riskin Does Not Teach or Render Obvious  703:72[b].

| **703:72[b]** | interface means coupled to said communication facility to interface said remote terminal apparatus for voice and digital communication with said individual callers based upon dialed number identification signals (DNIS) indicative of a called number provided automatically from said communication facility; |
|---|---|

703:72[b] requires "interface means" to interface callers for voice and digital

communication with callers based on DNIS.  Defendants only cite a portion of Riskin

discussing the receipt of DNIS by the CDSC 20 computer.  Brody Decl., ¶ 228.  This

text does not discuss if or how that computer interfaces callers *based on* DNIS, and

thereby does not show that Riskin discloses this limitation.  *Id.*

### 3.   Riskin Does Not Teach or Render Obvious  703:72[e] and [g].

| **703:72[e]** | voice generator means coupled through said interface means for providing vocal instructions to an individual caller to enter data and identification data; |
|---|---|
| **703:72[g]** | qualification means coupled to said interface means for limiting access during at least an interval of time to said processing means based upon comparing said identification data with previously stored identification data and wherein if a particular individual caller is not qualified, communication with that caller is either terminated or that caller is transferred to an interface terminal for communication with an operator; and |

### a.   Riskin does not teach a voice generator coupled through the interface means (72[e]).

Defendants identify CDSC 40 as a "voice generator," but make no showing

that the voice generator is coupled through the "interface means," CDSC 20, as

required by 703:72[e].  Brody Decl., ¶ 229.

### b.   Riskin does not teach limiting access to the processing means  "during at least an interval of time" (72[g]).

Defendants do not claim that Riskin limits access to the "processing means"

(which they identify as the Front End Computers and file server) during at least "an

interval of time" as required by 703:72[g], nor does Riskin do so.  Brody Decl., ¶¶ 230-236.  In fact, Riskin does not in *any* way suggest limiting access to the processing means, or provide motivation to do so.  *Id.*, ¶¶ 230, 235.  The only discussion in Riskin related to "an interval of time" is the use of an "hours field" to determine call handling.  Brody Decl., ¶¶ 231-234.  This "hours field" is not used to limit access to the processing means, but instead to find a nearby open dealer.  *Id.*

           **c.**      **Riskin does not teach qualification as in 72[e], [g].**

Under the Court's construction of "qualifying/qualified," 703:72[g] requires "determining whether a call is entitled to proceed" by comparing caller-entered identification data (gathered pursuant to 703:72[e]) with previously stored identification data.  *Id.*, ¶¶ 237, 239, 242.  The Riskin text defendants cite does not contain any such qualification and instead addresses entry of:  1) an "extension number" to compare against an Advertisement Records lookup table to verify if the caller entered a proper selection, 2) identification of whether the caller is inquiring about a product or service, and 3) "name and address in audio for later transcription to a mailing list."  *Id.*, ¶¶ 238-247.  The first two instances do not at all address caller-entered identification data, and the third addresses only *collection* of such data, not comparison to previously stored data.  *Id.*  A POSITA would not be motivated to add a qualification means to Riskin because it would be contrary to Riskin's purpose of connecting callers to dealers through an advertisement program.  *Id.*, ¶ 246.

           **d.**      **Riskin does not teach terminating calls or transfer to an operator based on qualification (72[e], [g]).**

Riskin does not teach that, if the system determines based on 703:72[e] caller-entered identification data that the caller is not "qualified," communication is terminated or the caller is transferred to an operator, as required by 703:72[g].  Brody Decl., ¶¶ 248-254.  Rather, the cited Riskin text teaches that the system checks the time of day in the "hours field" to determine what dealers are available and, if none are, how to then handle the call.  *Id.*, ¶ 249.  This text addresses not whether the

Heller
Ehrman LLP

23

caller is *qualified*, but how to *handle* the call.  *Id.*, ¶ 250-251.  Further, the "hours field" is not identification data entered by the caller pursuant to 703:72[e].  *Id.*, ¶¶ 251-252.  Defendants claim that 703:72[g]'s requirement of "qualification" is met by entry of a dealer's extension, data regarding whether the caller desires a product or a service, or the caller's entry of a name and address for transcription to a mailing list – however, defendants do not assert that Riskin determines whether to terminate or transfer a call based on entry of *these* items as required.  *Id.*, ¶ 250; *supra*, III.G.3.c.

### 4.    Riskin Does Not Teach or Render Obvious  703:72[h].

| 703:72[h] | means for storing coupled to said interface means for storing said data in association with said previously stored identification data. |
|---|---|

Defendants' argument that Riskin discloses storing data entered by the caller in association with "previously stored data" is flawed because defendants point to a first data set as being the "previously stored data" and fail to link the storing of caller entered data to that data set.  Brody Decl., ¶¶ 255-258.  703:72[h] requires storing caller-entered data in association with "previously stored data" referenced in 72[g].  *Id.*, ¶ 257.  Defendants identified "previously stored data" for purposes of 703:72[g] as the "Advertisement Records lookup table."  *Id.*, ¶ 256.  However, in addressing the operation of storing the caller entered data defendants assert that such data is stored "in association with" "data regarding the selected dealer," not the Advertisement Records lookup table.  *Id.*  Riskin clearly teaches that Dealer Records and Advertisement records are maintained in separate files, and defendants' attempt to equate the two is improper.  *Id.*, ¶ 257.  Therefore defendants' analysis fails to show that Riskin teaches or suggests the combination of elements [g] and [h].

### H.    Claim 116 of the '707 Patent Is Valid.

Claim 116 of the '707 patent depends on claims 115 and 96, and describes a system with an interface structure that receives voice as well as data that callers provide to the automated system in response to prompts, and calling number signals provided by the telephone network; a voice generator; a record structure for storing

Heller
Ehrman LLP

KATZ'S OPPOSITION TO COLLECTIVE MOTION FOR JUDGMENT    CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR PATENT INVALIDITY AS A MATTER OF LAW

data relating to the callers in accordance with the calling number data; qualification structure; and means for processing caller-entered data and calling number signals, where the callers provide other data that includes caller credit card number data. Defendants incorrectly rely upon Barger[7] and Kraus '908 to argue that claim 116 of the '707 patent is obvious.  Defendants ignore that the PTO considered Barger during the '707 prosecution (Martiniak Decl. Ex. 10), and then reconfirmed 707:116 during a recent reexamination (Brody Decl. ¶ 265).

### 1.   A POSITA Would Not Have Been Motivated To Combine Elements of Barger and Kraus '908 to Arrive at 707:116.

It would not have been obvious or desirable for a POSITA to combine elements of the fundamentally dissimilar Barger and Kraus '908 systems:  1) the Kraus credit information is insufficient for Barger, as Barger also gathers the intended shipping address and intended credit card, 2) the Kraus information is largely redundant, as Barger already gathers the caller's name, address and account information, 3) Barger already gathers sufficient data to run credit verifications so importing the Kraus credit check would be superfluous, 4) importing to Barger the ANI-based credit verification taught by Kraus would mis-identify callers based solely on a telephone number, and would limit callers to using a single telephone when there is no indication in Barger that this is desirable, and 5) the Kraus '908 pre-call credit verification does not make sense for Barger because a caller does not know beforehand whether he is going to make a purchase, and superfluous credit checks presumably incur unnecessary costs.  Brody Decl., ¶¶ 269-281.

### 2.   Barger and Kraus '908 Do Not Teach or Render Obvious 707:96[b].

| 707:96[b] | interface structure coupled to said communication facility to interface each of said remote terminals for voice and digital communication, and including means to provide signals representative of data developed by said remote terminals and for receiving said calling number identification data; |
|---|---|

---

[7] The Barger patent describes a system for callers to preview and purchase audio selections.  Brody Decl., ¶ 271.

Heller Ehrman LLP

The "means to provide signals representative of data developed by said remote terminals and for receiving said calling number identification data" element of 707:96[b] requires a § 112, ¶ 6 analysis. *See Ronald A. Katz Licensing, L.P. v. AT&T*, 63 F. Supp. 2d 583, 601 (E.D. Pa. 1999). Defendants fail to undertake this analysis, and therefore fail to show this claim limitation is anticipated or rendered obvious. Brody Decl., ¶¶ 283-284. As such, summary judgment is not proper. Defendants also fail to show that whatever provides signals is "coupled to said communication facility" as disclosed by 707:96[b]. Brody Decl., ¶¶ 285-289.

Further, Kraus '908 does not help defendants' argument because, while the Kraus '908 credit center receives ANI, it does not teach an interface structure, which must have voice capability, and the credit center does not receive "signals representative of data developed by [the] remote terminals." *Id.*, ¶ 289.

### 3. Barger and Kraus '908 Do Not Teach or Render Obvious 707:96[d].

| 707:96[d] | record structure, including memory and control means . . . for accessing a file and storing data relating to certain select ones of said individual callers in accordance with said calling number identification data; |
|---|---|

The "control means" of 707:96 is governed by 35 U.S.C. § 112 ¶ 6 and requires means plus function analysis. MDL Claim Construction, 39-40. Defendants fail to identify a "control means" as required by the Court's interpretation, ignore the Court's construction of that term, and do not perform the required § 112, ¶ 6 analysis. As such, defendants failed to show that Barger and Kraus '908 disclose this claim limitation and summary judgment is not proper. Brody Decl., ¶ 291-295.

Further, Barger and Kraus '908 do not teach "storing data relating to certain select ones of said individual callers *in accordance with said calling number identification data*" as required by 707:96[d]. *Id.*, ¶ 296-302. Barger does not teach ANI, and instead stores data by user account information. *Id.*, ¶ 299, 301. Kraus '908, on the other hand, only uses ANI to pre-verify the caller's credit, not for storing

data. *Id.*, ¶ 300.  A POSITA would not be motivated to combine these features to store data "in accordance with" ANI, especially given that Barger teaches a different method for storage.  *Id.*, ¶ 301-302.

### 4.  Barger and Kraus '908 Do Not Teach or Render Obvious 707:96[e].

| 707:96[e] | qualification structure controlled by said record structure for controlling access to said system by said individual callers; and |
|---|---|

While the defendants do identify the CPU (21) in Barger as the "qualification structure," they ignore the Court's construction of that term.  MDL Claim Construction, 30-33; Brody Decl., ¶ 303-306.  They do not perform a § 112, ¶ 6 analysis for this term and therefore have failed to show how Barger and Kraus '908 render obvious this limitation.  *Id.*, ¶ 305.  Further, defendants have not identified a "qualification structure" that is "controlled by said record structure for controlling access to said system by said individual callers."  *Id.*, ¶ 306.

### 5.  Barger and Kraus '908 Do Not Teach or Render Obvious 707:96[f].

| 707:96[f] | means for processing at least certain of said data developed by said terminals and said calling number identification data relating to certain select ones of said individual callers. |
|---|---|

The  "means for processing" element of 707:96[f] requires a § 112, ¶ 6 analysis.  *See AT&T*, 63 F. Supp. 2d at 608.  While the defendants do identify a "CPU or processor" – presumably CPU (21) – as the "processing means," they ignore the Court's construction of that term and fail to perform the required analysis.  Brody Decl., ¶¶ 310-311.  As such, defendants have not shown that this limitation is taught or rendered obvious, and summary judgment is improper.  Further, a POSITA would not combine elements of these systems to include a means for processing *both* data developed by said terminals *and* said calling number identification data (ANI).  *Id.*, ¶ 313.

### 6. Barger and Kraus '908 Do Not Teach or Render Obvious 707:115[a].

> **707:115[a]**   A system according to claim 96, wherein said individual callers provide other data.

Defendants imply that a system combining elements of  Barger and Kraus '908 would elicit a customer's name, address, and account or credit card number, and therefore disclose "individual callers provid[ing] other data," as required by limitation '707:115[a].  Brody, Decl., ¶ 316.  However, a POSITA would not have been motivated to combine the data-relay taught by Kraus '908 with the Barger system, as the data relayed would be superfluous and potentially inaccurate.  Brody Decl., ¶ 315.  Further, the combination would not meet 707:115[a] for at least two reasons:  1) with the combined system there would be no need for callers to enter "other data" as required by limitation 707:115[a], because what defendants identify as the "other data" would already have been relayed by Kraus '908; and 2) neither system involves automated entry of name and address data.  *Id.*, ¶¶ 315-317.  Kraus has first-time callers provide this data to an operator (indeed, it does not make sense to enter an address in an automated fashion) and Barger contains no teaching for how to automate this step.  *Id.*, ¶¶ 317-319.

### 7. Barger and Kraus '908 Do Not Teach or Render Obvious 707:116[a].

> **707:116[a]**   A system according to claim 115, wherein said individual callers provide caller credit card number data as said other data.

A system combining elements of Barger and Kraus '908 does not meet the requirements of 707:116[a] because the combination is not a system according to 707:115[a] or 707:96.  *Supra*, III.H.1-6.  Further, this claim element, read in context of the claim as a whole, requires the caller to provide a credit card number to an automated system in response to voice prompts – there is no reference to an operator.  Brody Decl., ¶ 321.  Barger, on the other hand, teaches a caller speaking the credit card number to an operator.  *Id.*

Heller
Ehrman LLP

## I.    Claim 201 of the '707 Patent is Valid.

Claim 201 of the '707 patent depends from claim 183 and describes a system that receives voice and touch-tone data, caller-entered identification data, and telephone network-provided calling number signals.  The system includes a voice generator, a record testing structure to receive and test the caller-entered identification data and calling number signals against previously stored caller identification and calling number data, and an analysis structure for processing the caller data signals.  The system also includes transfer structure for sending the call to an operator terminal that displays data accessed with the calling number identification signals.  Defendants incorrectly rely upon Daudelin '910 and Basinger to argue that claim 201 of the '707 patent is obvious.  Defendants ignore that 707:201 was reaffirmed in reexamination.  Brody Decl. ¶ 324.

### 1.    Daudelin '910 and Basinger Do Not Teach or Render Obvious 707:183[b].

| | |
|---|---|
| 707:183[b] | interface structure . . . to interface said remote terminals for voice and digital communication and including means to receive caller data signals representative of data relating to said individual callers, including caller personal identification data and said calling number identification data provided automatically from said communication facility; |

The "means to receive caller data signals" element of 707:183[b] is controlled by § 112, ¶ 6.  *See AT&T*, 63 F. Supp. 2d, at 601.  Summary judgment is thus inappropriate because defendants fail to undertake the requisite § 112, ¶ 6 analysis.  Brody Decl., ¶ 328.

Additionally, Daudelin '910 and Basinger do not teach or render obvious 707:183[b] because a calling card number is not "caller personal identification data" as the Court has defined that term.  Brody Decl., ¶¶ 332-341.  A calling card number is not equivalent to a telephone number (and indeed doesn't always include that number) and does not "identify the caller to the world at large."  *Id.*, ¶¶ 336-339.  Nor would a POSITA be motivated to use the caller's telephone number as the calling

Heller
Ehrman LLP

card number because this would make the system vulnerable to fraud.  *Id.*, ¶ 341.

### 2.  Daudelin '910 and Basinger Do Not Teach or Render Obvious 707:183[d].

| | |
|---|---|
| **707:183[d]** | record testing structure connected to receive and test said caller data signals including said calling number identification data and said caller personal identification data against previously stored calling number identification and caller personal identification data; and |

Defendants have not shown that Daudelin '910 and Basinger teach 707:183[d] because they have not performed a § 112, ¶ 6 analysis of the term "record testing structure," which was determined to be required by the *AT&T* Court.  Brody Decl., ¶¶ 342-344; *see AT&T*, 63 F. Supp. 2d at 608.  Further, defendants have not identified a "record testing structure" as required by 707:183[d].  *Id.*, ¶ 345-346.  Instead, defendants make the unsupported allegation that "the Daudelin '910 system" is the equivalent of the "record testing structure" in 707:183[d], but this is too broad of an assertion to identify the appropriate structures.  *Id.*, ¶ 346.

Additionally, Daudelin '910 and Basinger could not meet the requirements of this claim because the calling card number entered (supposedly in fulfillment of 707:183[b]) is compared against a database of *calling card data* (likely calling card *numbers*) – not "calling number identification" or "personal identification data."  Brody Decl., ¶¶ 347-350.  Defendants do not allege that the calling card number is compared to a telephone number, and as explained above, a calling card number is not "personal identification data."  *Id.*, ¶¶ 349-350; *supra*, III.I.1.

### 3.  Daudelin '910 and Basinger Do Not Teach or Render Obvious 707:183[e].

| | |
|---|---|
| **707:183[e]** | analysis structure for receiving and processing said caller data signals under control of said record testing structure. |

The "analysis structure" of 707:183 requires § 112, ¶ 6 means-plus-function analysis.  Defendants have not performed this analysis and have not demonstrated that any analysis structure is controlled by the record testing structure as required by 707:183[e].  Brody Decl., ¶¶ 351-355.  Thus, summary judgment is improper.

Heller
Ehrman LLP

30

J.     **Claim 67 of the '762 Patent Is Valid.**

Claim 67 of the '762 depends from claim 41 and describes a system with an interface structure that receives voice and touch-tone signals, including caller customer numbers, a credit verification structure, a record structure, acknowledgement structure for providing computer generated acknowledgement numbers, switching structure for sending callers to operators, and a central processing station coupled to the record structure to receive accumulated data on callers, where the interface also receives automatically-provided calling number signals. Defendants incorrectly assert that claim 67 is invalid in light of the combination of elements of Barger, Yoshizawa[8] and Kraus 908, ignoring that the PTO considered all three of these references during the '762 prosecution.  Martiniak Decl. Ex. 11.

1.     **A POSITA Would Not Have Been Motivated To Combine Elements of Barger, Yoshizawa And Kraus To Arrive At 762:67.**

A POSITA would not have been motivated to combine elements of Barger, Yoshizawa, and Kraus 908 because they are fundamentally dissimilar:  1) Yoshizawa teaches *away* from using an operator (required by 762:41[f]) while Barger uses and Kraus 908 *requires* operator assistance, 2) Barger does not address or contemplate the time pressures focused on by Yoshizawa, and 3) Kraus 908 employs ANI to retrieve information while Yoshizawa teaches away from ANI and Barger provides no motivation for use of ANI.  Brody Decl., ¶¶ 362-368.  Defendants do not explain why this combination would have been motivated.  *Id.*, ¶¶ 367-368.

a.     **Barger would not use ANI credit verification.**

A POSITA would not have modified Barger to use ANI-based credit verification as disclosed in Kraus 908 because ANI is not as reliable as the customer number Barger uses (multiple people could call from one number).  Brody Decl., ¶¶ 369-372.  And, even if Barger were so modified, it would then not meet the claim's

---

[8] Yoshizawa is a fully automated system in which a seasoned race track bettor who has learned the system can quickly place a bet under tight time constraints by keying in a cryptic code for the bet he wishes to place.  Brody Decl., ¶ 363.

Heller
Ehrman LLP

requirement (incorporated through 762:41[c]) that the caller's "customer number" be used to determine the caller's credit.  *Id.*, ¶ 370.

### b. Barger would not use a "registration number."

A POSITA would not have added the Yoshizawa "registration number" to Barger as an "acknowledgement number" because it would add an unnecessary layer of complication and would have reduced information-gathering functionality.  Brody Decl., ¶¶ 378-383.  The added complication of giving a caller a "registration number" is justified in Yoshizawa by the lack of a live operator and the time pressure of a race deadline.  *Id.*, ¶ 382.  By contrast, Barger already has an effective confirmation system (using audio messages) for purchases, employs operators (which is required by this claim), and does not face Yoshizawa's time constraints.  *Id.*, ¶¶ 381-382.  Further, in addition to canceling orders Barger operators can obtain the *reason* for the caller's cancellation, which is valuable information to a business.  *Id.*, ¶ 383.

### 2. Yoshizawa, Kraus 908 and Barger Do Not Teach or Render Obvious 762:41[b] and 762:67[a].

| 762:41[b] | interface structure  . . . to interface said remote terminals for voice and digital communication and including means to provide answer data signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number; |
|-----------|------------------|
| 762:67[a] | An analysis control system according to claim 41, wherein said interface structure receives calling digital data provided automatically by said communication facility indicative of said individual caller's telephone number |

Limitation 762:41[b] together with 762:67[a], requires both entry of a customer number and the use of ANI.  Brody Decl., ¶ 373.  None of the three references teach such a combination – there is no customer number used in Kraus 908, and there is no ANI used in Barger or Yoshizawa.  *Id.*  There is no motivation for a combination that requires both.  *Id.*

Heller
Ehrman LLP

### 3. Defendants Do Not Perform Required Means-Plus-Function Analyses For 762:41[b], [d]-[e].

| | |
|---|---|
| **762:41[b]** | interface structure . . . including <u>means to provide answer data signals</u> provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number; |
| **762:41[d]** | record structure including <u>memory and control means</u> connected to said interface structure . . . ; |
| **762:41[e]** | a<u>cknowledgement generator structure</u> for providing a computer generated acknowledgement number to said individual callers; |

The "means to provide answer data signals" element of 762:41[b], "memory and control means connected to said interface structure" element of 762:41[d], and "acknowledgement generator structure" element of 762:41[e] each require a means-plus-function analysis. *See AT&T*, 63 F. Supp. 2d at 601; MDL Claim Construction, at 38-40; Martiniak Decl., Ex. 3 (Texas Jt. Cl. Const. St. (5/24/06)). Because defendants have not performed the § 112, ¶ 6 analyses, defendants have not made even a prima facie showing that these limitations were obvious. Brody Decl., ¶¶ 374-377.

### 4. Yoshizawa, Kraus 908 and Barger Do Not Teach or Render Obvious 762:41[g].

| | |
|---|---|
| **762:41[g]** | central processing station coupled to said record structure to <u>receive accumulated data</u> on said individual callers |

Defendants appear to have erroneously analyzed 762:17[g]. Brody Decl., ¶ 384. Nowhere do defendants demonstrate that these references teach or suggest the "central processing station" as recited by 762:41[g]. Brody Decl., ¶¶ 384-385.

## IV. SUBSTANTIAL OBJECTIVE INDICIA OF NON-OBVIOUSNESS PRECLUDES SUMMARY JUDGMENT.

"Secondary considerations" of non-obviousness are central to an obviousness analysis. *KSR*, 127 S. Ct. at 1730. They "constitute[] independent evidence of non-obviousness," *Ortho-McNeil Pharm.*, 520 F.3d 1358 at 1364, and "must be considered before the issue of patent obviousness can be determined on a motion for summary judgment," *Ryko Mfg. Co. v. Nu-Star, Inc.*, 18 U.S.P.Q.2d 1047, 1048 (D.

33

Heller
Ehrman LLP

1  Minn. 1990), *aff'd*, 950 F.2d 714 (Fed. Cir. 1991).  In fact, they "may often be the

2  most probative and cogent evidence [of nonobviousness] in the record."  *Stratoflex,*

3  *Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

4         **A.**    **Long-Felt Need.**

5         Long-felt need was specifically identified in *Graham*, as reaffirmed in *KSR*, as

6  an important secondary consideration.  *See, Graham v. John Deere Co.*, 383 U.S. 1,

7  17-18 (1966); *KSR*, 127 S. Ct. at 1730.  As Judge Hand wrote, "the length of time in

8  the art, though needing the invention, went without it," may be the best non-technical

9  guidepost for inferring non-obviousness.  *Safety Car Heating & Lighting Co. v.*

10  *General Elec. Co.*, 155 F.2d 937, 939 (2d Cir. 1946).  Prior to the introduction of the

11  inventions claimed in the patents-in-suit, there was a long-felt need to identify

12  efficient methods of using both automated systems and operators to provide secure,

13  efficient, feature-rich, and cost-effective interactive telephony services to large

14  numbers of customers and other callers.  Brody Decl., ¶ 11.  Katz's inventions met

15  this long-felt need.  *Id.*

16         **B.**    **Commercial Acquiescence.**

17         Commercial acquiescence—*i.e.*, licensing—within an industry is "very

18  weighty evidence to sustain the presumption" of validity.  *Eibel Process Co. v.*

19  *Minnesota & Ontario Paper Co.*, 261 U.S. 45, 56 (1923).  "It is not necessary . . .

20  that the patented invention be solely responsible for the commercial success, in order

21  for this factor to be given weight appropriate to the evidence." *Continental Can Co.*

22  *v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).  A *litigant's* decision to

23  license the patents in suit is particularly telling.  *B & H Mfg. Inc. v. Foster-Forbes*

24  *Glass Co.*, 26 U.S.P.Q.2d 1066, 1070 (N.D. Ind. 1993) ("[The licensees who were

25  former litigants] have been represented to the court to be the most powerful . . .

26  companies [in this industry] . . . would not have bowed to pressure to take a license

27  without first reaching the conclusion that ultimately litigation would prove futile.").

28

Heller
Ehrman LLP

KATZ'S OPPOSITION TO COLLECTIVE MOTION FOR JUDGMENT   CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR PATENT INVALIDITY AS A MATTER OF LAW

1    The Katz patent portfolio – including each of the eight patents defendants

2  currently seek to invalidate – has been successfully licensed to over 225 entities for

3  fees well in excess of *$1.2 billion*, plus running royalties.  Declaration of James

4  Tramontana ¶¶ 2-3.  Many of these entities entered into their license agreements after

5  they were specifically informed – during licensing presentations – of some of the

6  particular claims here at issue.  *Id.*, ¶¶ 4-11.  Perhaps more significantly, over 50 of

7  the 225 entities to take a license did so after entering into litigation with Katz or a

8  previous assignee of the patents on many of the same patents challenged here. *Id.*, ¶

9  2; *see also* April 29, 2008 Declaration of Chris Martiniak, Ex. 4 at Response to

10  Interrogatory No. 9.

11  **V.    CONCLUSION**

12    Katz respectfully requests that the Court deny defendants' motion for summary

13  judgment.

14

15  Dated: May 30, 2008                          HELLER EHRMAN LLP

16

17

18                                    By   */s/ Robert T. Haslam*

19                                        ROBERT T. HASLAM
                                     Attorneys for Plaintiff RONALD A. KATZ
20                                    TECHNOLOGY LICENSING, L.P.

21

22

23

24

25

26

27

28

Heller
Ehrman LLP

KATZ'S OPPOSITION TO COLLECTIVE MOTION FOR JUDGMENT    CASE NO. 07-ML-01816-B-RGK (FFMx)
FOR PATENT INVALIDITY AS A MATTER OF LAW